PASSAIC UNITED HEBREW BURIAL ASSOCIATION, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1213-58.

United States District Court
D. New Jersey.
April 23, 1963.

Aaron Z. Schomer, Gurtman & Schomer, Passaic, N. J., for plaintiff.

David M. Satz, Jr., U. S. Atty., Newark, N. J., Louis F. Oberdorfer, Asst. Atty. Gen., Robert F. Sama, Dept. of Justice, Washington, D. C., for defendant.

AUGELLI, District Judge.

This is a suit for refund of a federal income tax deficiency and penalty assessed against and collected from plaintiff for the taxable year 1954 in the sum of $126.69.

Plaintiff claims to be exempt from federal income taxes under sections 501(a) and 501(c) (3) of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 501(a) and 501(c) (3). Section 501(a) exempts from taxation organizations described in section 501(c) (3). That section, in pertinent part, reads:

"Corporations, * * * organized and operated exclusively for religious, charitable, * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

The parties have stipulated that plaintiff is a corporation, and also that it does not engage in propaganda or political activity of any kind. The questions to be decided, then, are whether plaintiff is a corporation organized and operated exclusively for charitable or religious purposes, and whether any of its net

502

earnings inures to the benefit of private individuals.

The record shows that plaintiff was incorporated in 1921 under the New Jersey statute providing for the incorporation of associations not for pecuniary profit. Paragraph *"Third"* of plaintiff's corporate certificate states:

"The purposes for which this association is to [be] formed, are to transact a general undertaking, burial and funeral association for the purpose of providing for the remains of the indigent and poor of the Hebrew faith in the City of Passaic, and vicinity, where said family or families show bona fide evidence that they are in no position to care for or properly bury their dead, and in the discretion of the officers of the aforesaid corporation they may charge a reasonable fee where said person, family or families may be in a position to defray costs of said burial or part costs of said burial; these moneys to go into the treasury of said organization to be used for general burial costs."

In 1953, plaintiff amended its certificate of incorporation in several respects, and added thereto the following:

"All the property, assets and income of the association earned or acquired in excess of the amount necessary for the maintenance, operation and improvement of the association property and the cost of conducting funerals is hereby declared to be a trust fund, the income and principal of which, shall be devoted to the care of the aged and the chronic ill, in such manner and at such times as the Trustees shall from time to time determine."

In 1954, the tax year in question, plaintiff's membership consisted of the synagogues then in the Passaic-Clifton area, 11 in number; the Jewish community agencies in that same area, 8 in number, which owned cemetery property for the burial of their deceased members; and the Jewish Community Council, which is the central coordinating agency for the Jewish organizations in the area. The affairs of plaintiff are conducted by a Board of Trustees made up of 2 delegates and 2 alternates from each synagogue and organization and 7 delegates appointed by the Jewish Community Council. The Board of Rabbis of the Passaic-Clifton area supervises and controls the religious aspects of plaintiff's activities.

Whether or not a corporation is exempt from taxation as a charitable or religious organization is not, of course, to be determined by a mere reading or examination of its corporate charter. The facts in each case must be explored to ascertain the predominant or primary purpose for which the organization was formed, and also the manner of its operations. Samuel Friedland Foundation v. United States, 144 F.Supp. 74 (D. N.J. 1956).

The dispute in this case arises not so much in regard to the facts, but rather as to their interpretation. Some of the facts have been stipulated. From the record as a whole, the following picture emerges:

Under the Hebrew religion the burial of a deceased person is a religious undertaking and obligation. The rituals of an orthodox Jewish burial are governed by the Shulchan Aruch, the Jewish Code of Law. Members of the Chevra Kadisha [1] perform the religious rituals of the

---

1. The words "Chevra Kadisha" were translated by one of the rabbis who testified at the trial to mean "Holy Brotherhood". The Chevra Kadisha is said to have existed since time immemorial. Historically, members of this fraternity would attend at the bedside of a dying person, perform the last rites, and prepare the body for burial. Members of the Chevra Kadisha are elected for life by the congregation from among the most pious Jews in the community. They are entrusted with the performance, for the community at large, of the religious rituals required by the Shulchan Aruch. Upon the death of a member, the Chevra Kadisha elects a new member to fill the vacancy.

Shulchan Aruch, and prepare the body of the deceased person for burial. The actual funeral services, however, are conducted by a rabbi. No charge is made by members of the Chevra Kadisha for their services, but they do receive gratuities. It is also part of the orthodox ritual that interment must be in a Jewish cemetery, and that the hearse may not be used for one not of the Jewish faith.

When the Jewish community of Passaic and Clifton became established at the turn of this century, people of the Jewish faith living in that area, whenever a death occurred, would hold the burial services at the home of the decedent. It was there that the body would be prepared for burial and the religious rituals performed by the Chevra Kadisha. Indicative of indigency in the area is the fact that in 1910 a number of Jewish people banded together and formed the "Hebrew Free Burial Association of Passaic, New Jersey", a corporation not for pecuniary profit, the sole object of which was "to provide ways and means for the free burial of indigent deceased Hebrews".

Between 1910 and 1920, there was a considerable increase in the Jewish population in the Passaic-Clifton area, and an expansion, as well, of the geographical area inhabited by the families. These factors made it difficult for the Chevra Kadisha to reach the homes of deceased Hebrews in time to perform the required religious rituals [2]. As a result thereof, and for the purpose of providing a proper burial in accordance with the Judaic faith, a number of Jewish people in the community, in 1921, formed plaintiff association.

Initially, funerals were conducted from a chapel which plaintiff built in a store located on Columbia Avenue, described as being in a very poor section of Passaic. The present chapel, located on Howe Avenue, in the same city, was erected in 1949, and in 1955 was enlarged to its present size. The construction of the chapel and its subsequent enlargement was financed by donations, mortgage loans of $45,000.00, and Gemilath Chesed [3] loans totalling approximately $20,000.00. All of this indebtedness has been repaid.

In the conduct of its affairs, plaintiff employs 3 full-time employees, an administrative secretary, and 2 licensed undertakers. The former did not become a full-time employee until 1957. In 1962 the salary paid to one undertaker was $140.00 a week; the other was paid $120.00 a week; and the administrative secretary received a weekly salary of $180.00. The functions of the undertaker employees do not at all encroach upon the religious aspects of a burial. Preparation of the body for interment must be done by the Chevra Kadisha, and plaintiff's chapel may not be used unless there is strict compliance with the rituals of the Shulchan Aruch. In furtherance of its work, plaintiff, in 1958, purchased from the Hebrew Free Burial Association, approximately 110 cemetery plots for use for the burial, free of charge, of indigent persons of the Jewish faith. Prior to this acquisition, plaintiff used the plots of its members for the same purpose. Non-indigent families provide their own plots.

Plaintiff's Board of Trustees has established a more or less uniform schedule of charges for funeral services. Rates are set only high enough to cover anticipated operating expenditures. When a family is indigent, plaintiff conducts the funeral, with all the necessary religious rituals, free of charge. No Jewish burial is refused or turned away for lack of funds. Between 1949 and 1954, there were 19 free burials out of a total of 692, roughly, 2½%. A family unable to pay the full amount of the funeral bill pays only what it can afford. The

2. The burial of an orthodox Jew must be held before sundown on the day of death, or at the latest, the day following, if death occurs after sundown.

3. A "Gemilath Chesed" loan is one which, under Jewish law, carries with it no interest and bears no maturity date. It is said to be a debt created for any worthwhile purpose.

balance is written off on the books of the plaintiff. Approximately 62% of the funerals between 1949 and 1954 were conducted by plaintiff at or below their actual cost.

A source of profit to plaintiff is the sale of caskets, as distinguished from plain pine boxes. The caskets are sold only as an integral part of the funeral, and the profit realized therefrom, in excess of that needed to cover operating expenses, is devoted, under plaintiff's charter, to the "care of the aged and the chronic ill". Two to three times as many pine boxes as caskets are used in funerals conducted in plaintiff's chapel. Other profits may be realized from the sale of the pine boxes, shrouds, and procurement of burial permits. Plaintiff's entire income is derived only from contributions and payments received for funeral services. At no time has plaintiff advertised for or solicited business.

Prior to 1955, an added fee of from $10.00 to $15.00, for the use of plaintiff's chapel and hearse, was charged to families which did not belong to any of the synagogue or organization members of plaintiff. These excess fees charged to non-member families amounted to approximately $250.00 for the year 1954. Since 1955, plaintiff has added a charge of $50.00 for use of its services to any family which does not belong to any of its synagogues or agencies. The purpose of this extra charge, according to plaintiff, is to induce Jewish families in the area to join the member congregations or organizations.

Plaintiff's chapel is the only one operating in the Passaic-Clifton area. In Paterson, there are three funeral homes conducted for Jewish clientele. The religious rituals in these establishments are also performed by the Chevra Kadisha, and are acceptable to the local rabbis of Paterson, but there is not, in every instance, strict conformity with the orthodox requirements of the Shulchan Aruch. The Paterson funeral parlors are concededly commercial enterprises conducted by their owners for a profit.

One of the exhibits in evidence shows that plaintiff's earned surplus increased from $1,955.41 as of December 31, 1950 to $23,902.85 as of December 31, 1954. However, from December 31, 1949 to December 31, 1954, operating expenditures exceeded income in three of the six years. Plaintiff showed, in round figures, a profit of about $6,500.00 in 1950; $5,000.00 in 1951; $7,000.00 in 1952; $9,000.00 in 1953; and $298.68 in 1954 (this latter figure is the one reported by plaintiff to the Internal Revenue Service as taxable income for the year 1954). Some time subsequent to 1954, plaintiff made a grant of $25,000.00 to the Beth Israel hospital to be used for the "care of the aged and the chronic ill".

The defendant argues that plaintiff is a commercial enterprise, operated for profit. In support of this argument defendant points to the profit (as much as 100%) made on the sale of caskets, and the charges, running from $10.00 to $35.00 for obtaining burial permits which may cost only a dollar or two. The defendant also calls attention to the fact that plaintiff does not readjust its fees each year; that the fees in effect in 1949 continued through 1954; that said fees were increased in 1955, and not subsequently reduced even after the cost of plaintiff's chapel was fully paid. Another point made by defendant is that at the end of 1950 plaintiff had an earned surplus of $1,955.41 and that at the end of 1954, the earned surplus figure was $23,902.85; and that plaintiff's operations showed a profit that ranged from $6,500.00 in 1950 to $298.68 in 1954. In sum, defendant contends the operations carried on by plaintiff differ in no material respect from the services offered by the commercial funeral parlors located in Paterson.

Plaintiff does not deny that some of its transactions resulted in a profit, as alleged by defendant. But, says plaintiff, this income was merely incidental to its primary religious and charitable purposes. The accountant for plaintiff testified that he prepared, at defendant's request, the comparative balance sheet that

was received in evidence. That showed plaintiff's cash position to be $1306.65 at the end of 1949, and $2,922.60 at the end of 1954, a change of approximately $1600.00 during this period. The accountant further testified that a tax exempt organization, as contrasted with commercial organizations, is not interested in profit and loss. The only thing an exempt organization is interested in is the amount of money available to operate its plant. He also said the comparative balance sheet substantiated the testimony of plaintiff's administrative secretary that plaintiff's charges were fixed at a rate only high enough to cover anticipated operating expenditures. This witness further testified that plaintiff is on a cash basis and operates on the cash receipts and disbursements method. And with respect to the earned surplus figure of $23,902.85 for the year 1954, it was explained that this did not represent cash on hand; that the true cash position was $2,922.90 as of December 31, 1954; and that in a number of years between 1949 and 1954, expenditures exceeded receipts.

At this point it will prove helpful to consider some general principles laid down by the cases in dealing with this problem of exemption from taxation by corporations claiming to be "organized and operated exclusively for" religious or charitable purposes.

■ With an appreciation of the caveat suggested in Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945), it would still seem to be an established principle that statutes relating to tax exemption for charitable or religious purposes should be liberally construed. Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246 (1934); C. F. Mueller Co. v. Commissioner of Internal Revenue, 190 F.2d 120 (3 Cir., 1951); Lewis v. United States, 189 F.Supp. 950 (D.Wyo.1961).

■ It is also well established that making a profit on operations does not prevent an organization from obtaining a tax exemption if such profit is merely incidental to its primary charitable or religious purpose. Roche's Beach, Inc. v. Commissioner of Internal Revenue, 96 F.2d 776 (2 Cir., 1938); Jack Little Foundation for Aid to the Deaf v. Jones, 102 F.Supp. 326 (W.D.Okla.1951); Bright Star Foundation, Inc. v. Campbell, 191 F.Supp. 845 (N.D.Texas 1960); Scripture Press Foundation v. United States, 285 F.2d 800 (Ct.Cl.1961).

Each case, of course, must turn on its own facts. The basic problem is to determine the primary or dominant purpose for which plaintiff was created and to ascertain whether such purpose, if religious or charitable, is carried out in the operations conducted by plaintiff.

■■ The key words of the statute "organized and operated exclusively for" charitable purposes, were the subject of consideration by Judge Wortendyke in the Friedland Foundation case, supra. The term "organized" refers to the purpose of the organization as evidenced by the corporate charter and the factual circumstances surrounding its adoption and operations thereunder. Of course, "organized" cannot completely be divorced from "operated", for in the final analysis the purposes of an organization can best be drawn from a consideration of the manner in which it has been operated. The word "exclusively" relates to the purpose to which the income is ultimately devoted, and not to the manner of activity by which such income is obtained. C. F. Mueller Co. v. Commissioner of Internal Revenue, supra; Trinidad v. Sagrada Orden, etc., 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924); Lewis v. United States, supra. Finally, "charitable purposes" would embrace relief of indigent persons. It will not be necessary to define the meaning of "religious purposes" in view of the disposition the Court makes of this case.

■ In contending that plaintiff is a commercial enterprise, in business to earn a profit, defendant fails to give adequate consideration to plaintiff's charitable purposes as expressed in its certificate of incorporation to provide

for the burial of "the indigent and poor of the Hebrew faith" and the devotion of any "profit" to "the care of the aged and the chronic ill". The evidence amply supports the conclusion that these are the primary purposes for which plaintiff was organized and that its operations are carried on in fulfillment of such purposes.

The Court finds a close analogy between the operations of plaintiff and those of a non-profit hospital or home for the aged. The latter are regarded as tax-exempt by the Internal Revenue Service. See Rev.Rul. 56–185, CB 1956–1, p. 202; Rev.Rul. 61–72 1RB 1961–16. Like a non-profit hospital or home for the aged, plaintiff provides necessary services for those not able to pay. No one is denied a burial because of lack of funds, and payment is not expected from indigent families. Some pay nothing, others pay at rates which are at or below cost, and still others who are able to pay are charged a fee based on anticipated operating expenses. Plaintiff thus performs a community function by making available a necessary service to those who would otherwise not be able to provide for such service without financial hardship. If excess income is realized from operations, such excess, as previously mentioned, is dedicated to a similar charitable purpose—the "care of the aged and the chronic ill".

■ Defendant also contends that plaintiff should be denied a tax exemption because part of its net earnings inures to the benefit of private individuals. Defendant argues that the effect of the "extra charges", heretofore mentioned, on burials to those who do not belong to the synagogue or organization members of plaintiff, is to divert a portion of plaintiff's potential profit to those who do belong to such synagogues or organizations.

The words "private shareholder or individual" in section 501(c) (3) of the Internal Revenue Code of 1954, have been defined to refer to "persons having a personal and private interest in the activities of the organization". Regulations § 1:501(a)–1(c). The obvious purpose of this provision is to deny exemption to an organization that pays a dividend, either directly or indirectly, to its members. See 6 Mertens, The Law of Federal Income Taxation, section 34.13. The extra charges in this case, although having the effect of decreasing plaintiff's earnings ($250.00 in 1954), cannot be said to be a dividend to the families of decedents who belong to the synagogue or organization members of plaintiff. Such extra charges are surely not a cover or subterfuge for the distribution of net earnings to a shareholder, since it is only by the occurrence of a death that the family of the decedent receives this limited economic advantage from plaintiff.

Upon a consideration of all the evidence, the Court finds the facts of the case, as stated in this opinion, amply support plaintiff's claimed tax exemption, and concludes, as a matter of law, that:

1. The Court has jurisdiction of this action under 28 U.S.C.A. § 1346(a) (1).

2. Plaintiff is a corporation organized and operated exclusively for charitable purposes within the meaning of section 501(c) (3) of the Internal Revenue Code of 1954.

3. No part of the net earnings of plaintiff inures to the benefit of any private shareholder or individual.

4. No part of plaintiff's activities has ever been devoted to carrying on propaganda or otherwise attempting to influence legislation, nor has plaintiff at any time participated or intervened in any political campaign on behalf of any candidate for public office.

5. Plaintiff is an exempt organization under the provisions of section 501(c) (3) of the Internal Revenue Code of 1954.

Judgment for the 1954 tax year will be entered for plaintiff for $126.69, together with interest thereon from February 3, 1958.

Submit order.