BETHEL CONSERVATIVE MENNONITE CHURCH, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14992–81X.      Filed February 7, 1983.

*Richard L. Mintz*, for the petitioner.
*Keith A. Aqui* and *Henry G. Salamy*, for the respondent.

OPINION

DRENNEN, *Judge*: Respondent determined that petitioner
was not qualified for exemption from Federal income tax
under section 501(a),[1] as an organization described in section
501(c)(3). Petitioner has challenged respondent's determina-
tion by invoking the jurisdiction of this Court for a declaratory
judgment pursuant to section 7428. The issue is whether
petitioner was organized and operated exclusively for religious
or other exempt purposes for the years in question within the
meaning of section 501(c)(3) and the regulations thereunder.

This case was submitted for decision on the stipulated
administrative record pursuant to Rule 122.[2] The stipulated
administrative record is incorporated herein by reference. The

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect
during the taxable years in issue.

[2]All Rule references are to the Tax Court Rules of Practice and Procedure.

evidentiary facts and representations contained in such record are assumed to be true for purposes of this proceeding.

The Bethel Conservative Mennonite Church (petitioner) is located in Nappanee, Ind. From the time of its inception in 1955 to the time of filing its petition for declaratory judgment in this case, petitioner has had the same pastor, Homer Miller. He receives no pay for the performance of his pastoral duties. The church operates independently from other Mennonite congregations, and, prior to January 20, 1981, operated pursuant to the "Confession of Faith and Guiding Principles of the Bethel Conservative Mennonite Church." This document sets forth its Confession of Faith (the tenets of its belief), its standards and guiding principles, and provisions for its administration. The following are indicative of its beliefs, its standards, and its membership criteria, as set forth in that document:

(1) The belief that Jesus Christ is the Son of God and that His word is the final appeal and highest authority for members' lives;

(2) The belief that the purpose of the church is to oversee, teach to observe all things, make disciples, and maintain discipline by the principles of God's word;

(3) The belief that the Bible requires an adherence to the doctrine of nonresistance and therefore petitioner advocates nonparticipation in war or violence;

(4) The requirement that members regularly attend prayer service and Bible study (members who consecutively miss three communions without legitimate reason shall forfeit their membership);

(5) The requirement that members not conduct business or patronize public eating places on the Lord's day;

(6) The requirement that members not use tobacco, alcohol, or narcotics;

(7) The requirement that members not wear jewelry, necklaces, or faddish haircuts;

(8) The request that members abstain from the use of television and radio, and that they wear clothes of subdued and modest colors.

(9) Recognition that life insurance and membership in labor unions and secret societies are unscriptural. Belief that their

possessions are not their own and should be shared with those who are in need.

Petitioner's assets include various savings and checking accounts and a church building. Prior to January 20, 1981, no document provided for the distribution of these assets upon petitioner's dissolution.

In addition to the above document, petitioner established a set of procedural rules governing the church's business meetings. These rules were established in petitioner's "Constitution Governing Business Meetings." The primary purpose of such meetings was to discuss and review financial reports prepared by the church treasurer, as well as by various church committees. All members were invited to attend these meetings.

To become a member of petitioner, an individual was required to undergo a period of instruction on the tenets of its faith, conform to church discipline, and receive consent of the congregation. If the individual was accepted, he was required to be baptized. As of May 16, 1980, petitioner had 115 members.

Throughout its existence, petitioner has held regular worship services twice a week, on Wednesdays and Sundays. In addition, petitioner has engaged in numerous religious and charitable activities, including the following: Maintaining a Sunday school and Bible institute, providing financial support to the Marantha Bible School (discussed *infra*), providing financial support and religious services for various missions located in Indiana, engaging in numerous overseas evangelical programs, disseminating Christian literature, and arranging for guest speakers on Christian subjects.

In 1964, petitioner established a medical aid plan for its members. The purpose of the plan was "To share and bear one another's burden (Gal. 6 verse 2 and Phil. 2:4), which may arise from Medical Needs, Hospitalization, Surgery, and death of our members." The plan was available to all members in good standing and their dependents.

Pursuant to the plan as initially created, a member was required to pay the first $50 of any medical expense, after which the plan would pay the balance. The plan was funded by voluntary offerings from petitioner's members. These offerings were taken at church services on the first Sunday of each

month and more often if needed. Members desiring financial aid pursuant to this plan were to submit an itemized account of their claim to the treasurer of a committee composed of three members who administered this plan. The plan provided for a maximum payment of $100 for funeral and burial expenses.

By amendment to the plan made in 1966, the amount of medical aid provided to an individual in any year was limited to $250 plus a percentage of the excess. Also, one of the added amendments recited that the plan was "not intended to cover any expenses [for which] there is other coverage."

The following reflects the medical aid funds disbursed and the number of recipients of such funds from 1965 through 1979:

| Year | Amount | Number of recipients |
|------|--------|----------------------|
| 1965 | $2,834.04 | 8 |
| 1966 | 582.95 | 2 |
| 1967[1] | --- | 6 |
| 1968[2] | --- | --- |
| 1969 | 6,453.02 | 7 |
| 1970 | 3,362.01 | 9 |
| 1971 | 1,439.68 | 4 |
| 1972 | 2,681.25 | 5 |
| 1973 | 7,890.78 | 10 |
| 1974 | 1,212.90 | 4 |
| 1975 | 6,537.71 | 9 |
| 1976 | 4,945.30 | 8 |
| 1977 | 23,449.15 | 12 |
| 1978 | 16,535.69 | 14 |
| 1979 | 15,821.24 | 13 |
| Total | [3]93,745.72 | 111 |

[1] The amount disbursed in 1967, as indicated in the administrative record, was not legible.
[2] No figures were provided for 1968.
[3] During this same period, petitioner expended a total of $324,840.44 for its other programs and activities. Consequently, 22 percent of all disbursements during this period was for the medical care of petitioner's members.

In 1976, petitioner entered into the Midwest Mennonite Fellowship (MMF) with 14 other independent Mennonite churches. That organization was formed to establish and support the Marantha Bible School, located in Minnesota. Each member-church of MMF adopted "The Constitution of

the Midwest Mennonite Fellowship" which provided, inter alia, that upon dissolution of MMF all funds and other assets of the school and MMF were to be transferred to the constituent congregations, including that of petitioner. Petitioner's congregation contributed to MMF by collecting voluntary offerings every fifth Sunday.

Petitioner was financially supported by voluntary offerings made by members, plus interest earned on the portion of its funds kept in savings accounts. For the taxable years 1976 through 1979, petitioner received the following amounts of contributions and interest.

| Year | Contribution | Interest | Total income |
|------|-------------|----------|--------------|
| 1976 | $28,532.79 | $625.47 | $29,158.26 |
| 1977 | 35,973.78 | 736.79 | 36,710.57 |
| 1978 | 49,262.27 | 827.91 | 50,090.18 |
| 1979 | 53,796.83 | 918.74 | 54,715.57 |

On May 20, 1980, petitioner filed an application for recognition of exemption under section 501(c)(3). On October 23, 1980, respondent sent notice to petitioner that its application would not be approved. Respondent initially concluded that petitioner was not *organized* exclusively for exempt purposes because "Neither your Confession of Faith nor Constitution [Governing Business Meetings] contain a statement of your purposes or provide for the dispostion of your assets." He further concluded that the constitution of the Midwest Mennonite Fellowship neither set forth petitioner's purpose nor provided for the disposition of petitioner's assets. Respondent also concluded that petitioner was not *operated* exclusively for exempt purposes since, in respondent's view, the Bethel Medical Aid plan served the private interests of petitioner's members.

Petitioner timely protested this ruling and requested a conference to determine what it needed to do in order to obtain exempt status. Subsequently, on January 20, 1981, petitioner adopted the "Constitution of the Bethel Conservative Mennonite Church" in response to negotiations with respondent. This document stated that the church had been organized exclusively for religious, charitable, and educational purposes. It substantially reflects the provisions of the "Confession of Faith and Guiding Principles of the Bethel Conservative Mennonite Church" and the "Constitution Governing Business Meetings." The constitution also provided that upon dissolution "all

funds and other assets and/or property of the Church shall be transferred to other constituent organizations operated exclusively for charitable, educational, or religious purposes as shall qualify as an exempt organization under section 501(c)(3)." It made no provision for the medical aid plan which was discontinued by January 20, 1981.

Thereafter, on March 27, 1981, petitioner received a final adverse ruling as to its exempt status under section 501(c)(3) for the taxable period *prior* to January 20, 1981. This ruling was made for the following reasons:

You were not organized and operated exclusively for exempt purposes within the meaning of section 501(c)(3). You lacked articles of organization and served a private rather than public interest.

Petitioner was approved for exempt status for the taxable period beginning January 20, 1981.

Petitioner has exhausted the administrative remedies available to it within the Internal Revenue Service.

Pursuant to section 7428(a), petitioner filed a petition for declaratory judgment requesting the Court to declare respondent's final determination that petitioner was not an organization described in section 501(c)(3) to be incorrect.

Section 501(a)[3] provides that an organization described in, inter alia, section 501(c)(3)[4] shall be exempt from Federal income tax if it meets three requirements, namely, that it is organized and operated exclusively for religious or other exempt purposes; that no part of its net earnings inures to the benefit of any private individual; and that no substantial part

---

[3]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

[4]SEC. 501(c). LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

*　　　*　　　*　　　*　　　*　　　*　　　*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition * * * or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

of its activities is carrying on propaganda, influencing legislation, etc. See *Western Catholic Church v. Commissioner*, 73 T.C. 196, 206 (1979); affd. in an unpublished opinion 631 F.2d 736 (7th Cir. 1980); *Christian Manner International v. Commissioner*, 71 T.C. 661, 665 (1979). Because respondent denied petitioner exemption for its alleged failure to comply with the first requirement only, the only issue we need decide is whether petitioner was organized and operated exclusively for · religious or other exempt purposes.

Failure to meet either the organizational or operational test is fatal to petitioner's position. Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs.; *Gen. Conf. of the Free Church v. Commissioner*, 71 T.C. 920, 926 (1979); *Church in Boston v. Commissioner*, 71 T.C. 102, 106 (1978). Although respondent claims that petitioner has failed to meet both of these tests, we will limit our decision to the latter because we agree that due to the existence of petitioner's medical aid plan, petitioner was not operated exclusively for religious or other exempt purposes[5] prior to January 20, 1981.

We have no doubt petitioner was a bona fide church whose doctrines were based on fundamental Christian principles as set forth in the "Confession of Faith and Guiding Principles of the Bethel Conservative Mennonite Church." Since 1955, petitioner has held regular biweekly worship services, has established and maintained Bible institutes, has supported numerous relief programs for the elderly and needy, and has engaged in domestic and foreign evangelical programs. In addition, petitioner holds weekly Sunday school and Bible study sessions for its members and has arranged for guest speakers on Christian subjects. Petitioner's assets include a church building and in 1980, petitioner had 115 members.

However, it has been held that, with respect to determining entitlement to a deduction for contributions to a church under section 170(b)(1)(A)(i), while "every church may be a religious organization, every religious organization is not per se a church." *Chapman v. Commissioner*, 48 T.C. 358, 363 (1973); *American Guidance Foundation, Inc. v. United States*, 490 F.

---

[5]In view of our holding herein, we do not address petitioner's assertion that the regulations under sec. 501(c)(3) implementing the organizational test do not validly interpret the statute.

Supp. 304, 306 (D. D.C. 1980). We think that in the context of section 501(c)(3) the reverse is true, namely, that a bona fide church is not, per se, exempt from taxation as a religious organization. Exemption from Federal income taxation is a privilege provided as a matter of legislative grace, not a right. *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 74 T.C. 531 (1980), affd. 670 F.2d 104 (9th Cir. 1981); *Gen. Conf. of the Free Church v. Commissioner, supra* at 931. Specifically, Congress has mandated that qualification for exemption requires, inter alia, that the organization operate *exclusively* for exempt purposes. Exclusivity in this instance does not mean "solely" or "without exception," but rather contemplates that any nonexempt activities be only incidental and less than substantial. Sec. 1.501(c)(3)-(1)(c)(1), Income Tax Regs.; *Church in Boston v. Commissioner, supra* at 107. See also *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). Thus, if a church engages in a substantial nonexempt activity, it does not meet the operational test of section 501(c)(3), regardless of how substantial its religious or other exempt activities may be. See *Schoger Foundation v. Commissioner*, 76 T.C. 380, 386 (1981); *Baltimore Regional Joint Board Health and Welfare Fund v. Commissioner*, 69 T.C. 554, 558 (1978); *Copyright Clearance Center, Inc. v. Commissioner*, 79 T.C. 793 (1982).

In addition to its many clearly religious or charitable activities, petitioner established a medical aid plan for its members and their dependents only. The plan specifically provided that no membership fee was required so as not to exclude any of petitioner's members from taking part in the plan. The plan was funded by voluntary offerings collected from the members at worship services on the first Sunday of each month. The plan initially provided that the first $50 of medical expenses was to be paid by the member, after which the balance would be paid by petitioner.

A committee which consisted of three church members was in charge of the plan, and an individual desiring medical aid under the plan was required to submit an itemized account of his claim to the committee treasurer. The plan was amended in 1976, so that to the extent a member's medical expenses exceeded $250 in any year, petitioner would pay only a percentage of the excess. Also, one of the added amendments

recited that the plan was "not intended to cover any expenses [for which] there is other coverage."

Respondent maintains that the plan was not in furtherance of an exempt purpose, but rather was intended solely to serve the private interest of its members. He further claims that the operation of the plan constituted a substantial nonexempt activity. To the contrary, petitioner claims that the plan was in furtherance of one of the seven ordinances of the Mennonite faith[6] to come to the assistance of its needy, and, therefore, did serve a religious or otherwise exempt purpose. Alternatively, if the plan is considered to be operated in furtherance of a nonexempt purpose, petitioner claims that it constituted only an insubstantial part of its activities.

The crucial inquiry is not into the nature of the activity, but rather into the purpose accomplished thereby. See *Federation Pharmacy Services, Inc. v. Commissioner*, 72 T.C. 687 (1979), affd. 625 F.2d 804 (8th Cir. 1980); *Christian Manner International v. Commissioner, supra*. The purpose of the medical aid plan must have been to provide aid in a nondiscriminatory, objective manner, and in furtherance of an exempt purpose. See *Church in Boston v. Commissioner, supra* at 107; *Western Catholic Church v. Commissioner, supra* at 210 n. 28.[7]

The medical aid plan specifically provided that all members of petitioner and their dependents were covered under the plan. There is no indication that aid was provided only to members determined under objective criteria to be needy as petitioner claims. Medical aid was provided for any member who claimed it. Failure to establish criteria for disbursements creates the potential for abuse. It has been held that financial aid given on a personal basis rather than in an objective and nondiscriminatory manner does not constitute an activity in furtherance of an exempt purpose. See *Church in Boston v. Commissioner, supra* at 107.

Furthermore, the plan was expressly available to members and their dependents only, thereby excluding the public and

---

[6]The ordinance referred to by petitioner was the following: "The anointing of oil for the healing of the sick (James 5:14–15)."

[7]See also *Federation Pharmacy Services, Inc. v. Commissioner*, 72 T.C. 687, 692 (1979); *Baltimore Regional Joint Board Health and Welfare Fund v. Commissioner*, 69 T.C. 554, 557–558 (1978).

limiting the benefits to members only. See sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs.;[8] *Baltimore Regional Joint Board Health and Welfare Fund v. Commissioner, supra* at 558. Based on the evidence contained in the administrative record, we cannot say that respondent erred in determining that the medical aid plan was in furtherance of the private interests of petitioner's members and was a nonexempt activity. The plan did not, in and of itself, qualify as an exempt activity. It served the private interests of petitioner's members by paying their medical bills, which was its stated purpose. Nor did the plan in any way further the other exempt purposes and activities of petitioner.

Petitioner argues that the medical aid plan furthered the exempt purposes of petitioner by supporting the tenets of their faith to provide assistance to the needy and take care of their own. Certainly this is a worthy purpose and is undoubtedly practiced by the Mennonites in many ways. But the benefits of this plan are not limited to even the needy of its members, and we fail to see how taking care of its own furthers any religious or other exempt purpose of petitioner. While petitioner's Confessions of Faith discourages its members from taking out life insurance, it says nothing about medical insurance, which is what this plan appears to be. So there is no link that we observe between this plan and petitioner's tenets of faith.

In determining whether this nonexempt activity was substantial, the percentage of medical aid disbursements vis-a-vis the total income of petitioner is enlightening. See *Church in Boston v. Commissioner, supra* at 107–108; *Baltimore Regional Joint Board Health and Welfare Fund v. Commissioner, supra* at 558. The following reflects such percentage for the taxable years 1976 through 1979:

| Year | Total income | Medical aid disbursements | Percentage |
|------|--------------|---------------------------|------------|
| 1976 | $29,158.26 | $4,945.30 | 17 |
| 1977 | 36,710.57 | 23,449.15 | 64 |

[8]Sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs., states:

"An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. * * * "

| 1978 | $50,090.18 | $16,535.69 | 33 |
| 1979 | 54,715.57 | 15,821.24 | 29 |

Also, approximately 22 percent of all disbursements made between 1965 and 1979 was for the medical aid of petitioner's members. See *supra* p.7 note 3. Comparé *Church in Boston v. Commissioner, supra,* and *Baltimore Regional Joint Board Health and Welfare Fund v. Commissioner, supra.* Furthermore, the medical aid program was governed by a committee of three elected church members, which made regular reports on receipts and disbursements in connection with the plan. Also, at least once a month, petitioner collected voluntary offerings from its members to fund this plan. While we do not believe that the medical aid plan was petitioner's primary activity, in view of the above, we cannot say that it constituted only an insubstantial activity of petitioner.[9]

Thus, based on the evidence before us, we find that the medical aid plan constituted a substantial nonexempt activity. We therefore hold that prior to January 20, 1981, petitioner was not operated *exclusively* for religious or other exempt purposes.[10] Respondent's determination is sustained.

*An appropriate order will be entered.*

---

[9]We do not imply that the incidental use of a small part of a church's funds to provide medical aid to some of its needy members would prevent the church's qualification under sec. 501(c)(3).

[10]Having thus held, it is not necessary for us to consider respondent's contention that petitioner was not *organized* exclusively for religious purposes. We note, however, that prior to Jan. 20, 1981, petitioner had no organizational document that clearly stated an exempt purpose or permanently dedicated its assets to religious, charitable, or other exempt purposes. See *Gen. Conf. of the Free Church v. Commissioner,* 71 T.C. 920, 928–929 (1979); *Calvin K. of Oakknoll v. Commissioner,* 69 T.C. 770 (1978), affd. per curiam 603 F.2d 211 (2d Cir. 1979); sec. 1.501(c)(3)–1(b)(4), Income Tax Regs.