**BETHEL CONSERVATIVE MENNONITE CHURCH, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 83–2350.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1984.

Decided Oct. 17, 1984.

Leonard J. Henzke, Jr., Lehrfeld & Henzke, Washington, D.C., for petitioner-appellant.

Bruce R. Ellisen, Atty., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BAUER, WOOD and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

Bethel Conservative Mennonite Church (Bethel Mennonite) appeals the Tax Court's affirmance of the Commissioner's determination that Bethel Mennonite was not qualified for exemption from federal income tax under Section 501(a) of the Internal Revenue Code, as an organization described in Section 501(c)(3). I.R.C. §§ 501(a) & 501(c)(3) (1976). The issue before us is whether Bethel Mennonite was organized and operated exclusively for religious or other exempt purposes before January 20, 1981, within the meaning of Section 501(c)(3) and the regulations thereunder. Because the case was submitted to the Commissioner on a stipulated administrative record, that record is presumed true for purposes of the tax court proceeding and for purposes of this appeal.

I

Bethel Mennonite is located in Nappanee, Indiana. From the time of its inception in 1955 to the present, Bethel Mennonite has had the same pastor, who receives no compensation for his pastoral duties. The church operates independently of other Mennonite congregations, and, prior to January 20, 1981, operated pursuant to its "Confession of Faith." This document sets forth the tenets of the congregation's beliefs, the "Standards and Guiding Principles," and the provisions for the church's administration. In 1976, Bethel Mennonite entered into the Midwest Mennonite Fellowship with fourteen other independent Mennonite churches. Although the Fellowship was formed to establish and support the Marantha Bible School in Lansing, Minnesota, each member church of the Fellowship must adopt "The Constitution of the Midwest Mennonite Fellowship." This Constitution provides, among other things, that each member-congregation must "appreciate our Christian heritage as brought to us through the Mennonite Church, and [is] by the Grace of God endeavoring to preserve the heritage." Fellowship Constitution, art. III, pt. A.Adm.R. ex. 2(c).

To become a member of Bethel Mennonite, an individual is required to undergo a period of instruction on the tenets of its faith, conform to church discipline, and receive consent of the congregation. If the individual is accepted, he is required to be baptized. As of May 16, 1980, Bethel Mennonite had 115 members. Throughout its existence, Bethel Mennonite has held regular worship services twice a week and has engaged in numerous religious and charitable activities. In 1964, Bethel Mennonite established a medical aid plan for its members. The purpose of the plan was "[t]o

share and bear one another's burden (Gal. 6 verse 2 and Phil. 2:4), which may arise from Medical Needs, Hospitalization, Surgery, and death of our members." The Bethel Medical Aid Plan, Adm. R. ex. 2(*o*). The plan was available to all members of the congregation in good standing and their dependents.

On May 20, 1980, Bethel Mennonite filed an application for recognition of exemption under Section 501(c)(3) of the Tax Code. On October 23, 1980, the Commissioner sent notice to Bethel Mennonite that its application would not be approved. The Commissioner concluded that Bethel Mennonite was not organized exclusively for exempt purposes because its documents did not contain a statement of its purposes or provide for the disposition of its assets on dissolution. The Commissioner also concluded that Bethel Mennonite was not operated exclusively for exempt purposes because the Bethel Medical Aid Plan served the private interests of its members.

Bethel Mennonite timely protested this ruling and subsequently adopted a new constitution that stated that the church had been organized exclusively for religious, charitable, and educational purposes, and provided properly for the distribution of its assets on dissolution as suggested by the Commissioner. The new Bethel Mennonite Constitution made no provision for the Medical Aid Plan that was discontinued by January 20, 1981.

On March 27, 1981, Bethel Mennonite received a final adverse ruling as to its exempt status under Section 501(c)(3) for the taxable period preceding January 20, 1981. Bethel Mennonite was approved, however, for exempt status for the taxable period beginning January 20, 1981. Bethel Mennonite exhausted its administrative remedies within the Internal Revenue Service and filed a petition for a declaratory judgment in the Tax Court, pursuant to I.R.C. § 7428(a), requesting the Tax Court to declare the Commissioner's final determination that Bethel Mennonite was not an organization described in section 501(c)(3) to be incorrect. The Tax Court upheld the

Commissioner's determination, 80 T.C. 352 (1983), and held that because the plan was available to Bethel Mennonite congregation members and their dependents only, the Commissioner did not err in determining that the plan was in furtherance of the private interests of the members of Bethel Mennonite. Moreover, the Tax Court held, the amount of the church's funds going to the Medical Aid Plan was not insubstantial. Because the Tax Court found that the Commissioner was correct in determining that Bethel Mennonite was not operated for an exempt purpose prior to January 20, 1981, the Tax Court found it unnecessary to discuss or decide whether the Commissioner was correct in determining that Bethel Mennonite was not organized for an exempt purpose prior to that date. After a thorough review of the record, we find that the Commissioner was incorrect in both of his determinations.

## II

Among the various requirements for an organization to receive tax exemption under Section 501(c)(3), it must be organized and operated exclusively for religious or other exempt purposes. This requirement is conjunctive; failure to meet either requirement will result in denial of the exemption. Treas.Reg. § 1.501(c)(3)–1(a)(1). The Commissioner denied Bethel Mennonite its exemption for failure to meet both requirements.

The Tax Court held that Bethel Mennonite's Medical Aid Plan was a sufficient basis on which the Commissioner could deny the tax exemption. The Tax Court stated that although it considered Bethel Mennonite "a bona fide church whose doctrines were based on fundamental Christian principles," 80 T.C. at 358, the administrative record supported the Commissioner's conclusion that the Aid Plan constituted a substantial nonexempt activity. *Id.* at 359. Because the Tax Court determined that the plan involved twenty-two percent of the church's funds and was intended solely to serve the private interests of the church's members, tax exemption was denied.

Bethel Mennonite contends that regardless of the fact that the Plan is limited to giving aid to members of its congregation only, the plan was established and maintained in furtherance of one of the seven ordinances of the Mennonite faith to come to the assistance of its needy, and as such did serve a religious purpose. The Tax Court dismissed this rationale and stated that "[c]ertainly this is a worthy purpose and is undoubtedly practiced by the Mennonites in many ways. But the benefits of this plan are not limited to even the needy of its members, and we fail to see how taking care of its own furthers any religious or other exempt purpose of [Bethel Mennonite]." *Id.* at 361.

■ We think that the Tax Court erroneously held that there was "no link ... between this plan and [Bethel Mennonite's] tenets of faith," *id.,* and uses too narrow a definition of "needy" in this case in applying Bethel Mennonite's beliefs to its religious practices. The Medical Aid Plan states that its purpose is "to share and bear one another's burden (Gal. 6, verse 2 and Phil. 2:4), which may arise from Medical Needs, Hospitalization, surgery, and death of [its] members," Adm.R. ex. 2(*o*), and directly supports the congregations eighth Standard and Principle that its members' "possessions are always on the alter [sic] before God to be used in meeting the needs of our Brethren." Adm.R. ex. 2(m).

It was erroneous for the Tax Court to adopt its own definition of needy in this case and apparently to use the term to apply only to those who are financially needy. The Bethel Mennonite congregation, as with the Mennonite faith in general, consider all of its members to be needy and thereby deserving of one another's assistance, regardless of their own financial means. As the Supreme Court recognized in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), Conservative Mennonite congregations "are characterized by a fundamental belief that salvation requires life in a community separate and apart from the world and worldly influence. This concept of life aloof from the

world and its values is central to their faith." *Id.* at 210, 92 S.Ct. at 1530. For the Tax Court to say, therefore, that Bethel Mennonite cannot pool its funds for the benefit of its congregation's medical needs, in a manner which the congregation deems necessary to support its religious beliefs seems incredulous to us. Moreover, to say that simply because the pooled funds are dispersed only among the contributing congregation it thereby results in a private, nonexempt activity misapplies the law. Religions by their very nature provide many services that benefit only the members of the individual congregation, and to say that any church which so provides these benefits must be denied tax exemption would disrupt many organized churches as we know them. *See, e.g., O'Leary v. Social Security Board,* 153 F.2d 704 (3d Cir.1946) (Catholic cemetery which served only Roman Catholics was exempt under Social Security Act analogue of Section 501(c)(3)); *Passiac Hebrew Burial Assn. v. United States,* 216 F.Supp. 500 (D.N.J.1963) (Hebrew mortuary operated by local synagogues providing Hebrew funerals and burials for fees and to members of Jewish religion only is exempt); Rev.Rul. 74–575, 1974–2 Cum.Bull. 162 (Jewish organization supervising preparation of food, inspecting food products, and monitoring use of "kosher approved" labelling is exempt); Rev. Rul. 71–580, 1971–2 Cum.Bull. 235 (Mormon geneology society designed to provide religious geneological information needed by church members is exempt).

The crucial inquiry, as the Tax Court points out, is not into the nature of the activity, but into the purpose accomplished thereby. *Federation Pharmacy Serv., Inc. v. Comm'r,* 72 T.C. 687 (1979), *aff'd* 625 F.2d 804 (8th Cir.1980). We believe the Tax Court misapplied this doctrine. "The facts in each case must be explored to ascertain the predominant or primary purpose for which the organization was formed, and also the manner of its operation." *Passaic Burial Assn.,* 216 F.Supp. at 502. We think that it is clear from the record before us that the purpose of the program unquestionably is to provide an

organized means for the Bethel Mennonite community to implement the longstanding Mennonite belief in the pooling of resources for its members' benefit regardless of the members' personal financial resources. The present case is quite unlike several of the cases relied on by the Tax Court wherein Section 501(c)(3) exemptions were denied because the "churches'" purposes were not those for which exemptions could be granted. *See, e.g., Bubbling Well Church of Universal Love, Inc. v. Comm'r*, 74 T.C. 531 (1980), *aff'd*, 670 F.2d 104 (9th Cir.1981); *Western Catholic Church v. Comm'r*, 73 T.C. 196 (1979), *aff'd in an unpublished order*, 631 F.2d 736 (7th Cir.1980). Moreover, if we were to consider member-only services in determining the tax exemption of a church, it also would be necessary to consider activities which could not be measured in dollar terms to determine whether the activity was a substantial part of the church's total activities.

■ Even if we did not consider this purpose clear from the record, we would not completely be precluded from considering the other documents which Bethel Mennonite asked the Tax Court to consider in its motion for reconsideration of findings of fact. Although the Tax Court in a declaratory judgment action generally cannot consider matters not in the administrative record, supplementation of the record is proper when good cause is shown. I.R.S. Rule 217(a). Where the question before the Tax Court is one implicating a religion's practices or beliefs, good cause to supplement the administrative record exists on the allegation that the Commissioner has erroneously interpreted or has redefined that religion's beliefs. That we should scrupulously guard the free exercise of religion, *see, e.g., Sherbert v. Verner*, 374 U.S. 398, 406–407, 83 S.Ct. 1790, 1795–1769, 10 L.Ed.2d 965 (1963), weighs heavily in favor of supplementing the record here where, as a result of the Commissioner's determination, Bethel Mennonite discontinued its Medical Aid Plan, which on the administrative record was established as part of the church's belief that it must "[b]ear ye one another's burdens." *Gal.* 6:2. We believe, therefore, that good cause has been shown in this case and Bethel Mennonite should have been allowed to supplement the administrative record before the Tax Court with other church documents which add to Bethel Mennonite's claim that its Aid Plan was established and operated to further a bona fide religious purpose and that the Commissioner's determination to the contrary was clearly erroneous.

■ It is not necessary, moreover, to remand this case to the Tax Court or to the Commissioner for a consideration of these church documents which detail the history of various mutual aid practices. These documents are clearly the kind for which judicial notice by an appellate court is appropriate. *See generally Ives Laboratires, Inc. v. Darby Drug Co.*, 638 F.2d 538, 544 n. 8 (2d Cir.1981) (court took judicial notice of facts which it found indicated that premise of trial judge's decision had no support). The history and beliefs of Mennonites is the type of fact which is subject to "verification by reference to authoritative sources." *See* Weinstein & Berger, 1 Weinstein's Evidence ¶ 201[03] n. 26, and cases cited therein.

After reviewing these documents, included in the record before us as the appendices to Bethel Mennonite's brief on its Motion for Reconsideration in the Tax Court, R. 20, we are fully convinced that the Medical Aid Plan was simply another form of the various mutual aid plans established and used by the Mennonites in general to further their strongly held religious belief that they must "bear one another's burdens."

We therefore find that the Medical Aid Plan was in furtherance of an exempt purpose. Consequently, Bethel Mennonite was operated for an exempt purpose and the Commissioner's denial of exemption because of the Medical Aid Plan was error and is reversed.

## III

Although the Tax Court did not discuss whether Bethel Mennonite was organized for an exempt purpose prior to January 20, 1981, the Commissioner did consider the issue and determined that it was not. We will now consider that issue. Our review of the record and the Treasury Regulations convinces us that the Commissioner has improperly applied those regulations.

 The regulations elaborate on the organizational test for exemption and state that "[a]n organization is not organized exclusively for one or more exempt purposes unless its assets are dedicated to an exempt purpose." Treas.Reg. § 1.501(c)(3)–1(b)(4). The Commissioner held that because Bethel Mennonite's articles of incorporation did not provide for the distribution of assets on dissolution of the church, Bethel Mennonite was not organized for an exempt purpose. We disagree. The regulation expressly states that the manner of distribution of assets is only one means by which the Commissioner can determine that the assets are dedicated to an exempt purpose, and that a provision in the articles of incorporation is only one means by which the Commissioner can determine that the assets will be so distributed. The regulation also states that an organization is organized for an exempt purpose if the assets would "by operation of law, be distributed for one or more exempt purposes, ... or would be distributed by a court to another organization to be used in such manner as in the judgment of the court will best accomplish the general purposes for which the dissolved organization was organized." *Id.* Thus, that Bethel Mennonite had no distribution provision in its charter before January 20, 1981, does not mandate that exemption automatically be denied. In fact, Indiana law does indeed adequately satisfy the distribution provisions of the regulation.

Although Bethel Mennonite did not provide expressly for the distribution of its assets on dissolution, its pastor submitted an affidavit to the Commissioner which expressed his interpretation of the Fellowship Constitution that this document provided that any Fellowship member's assets would be transferred to other members of the Fellowship in the event of that member's dissolution. Adm. R. ex. 2(a). Moreover, even if for some reason the Church's property could not be distributed to members of the Fellowship, Indiana follows the common law rule that church property may not be distributed for private use as long as there remains someone who will carry on its use for church purposes. *See United Methodist Church v. St. Louis Crossing Independent Methodist Church,* 150 Ind. App. 574, 276 N.E.2d 916, 919 (1972). This aspect of Indiana law, combined with the Tax Court's recognition that Bethel Mennonite is a bona fide church, convinces us that the church was organized for exempt purposes prior to January 20, 1981, within the meaning of Section 501(c)(3).

We therefore reverse the decision of the Tax Court and hold that prior to January 21, 1981, Bethel Mennonite was organized and operated for religious purposes within the meaning of Section 501(c)(3).

REVERSED.