ALIVE FELLOWSHIP OF HARMONIOUS LIVING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Alive Fellowship of Harmonious Living v. Commissioner
Docket No. 8160-81X.
United States Tax Court
T.C. Memo 1984-87; 1984 Tax Ct. Memo LEXIS 586; 47 T.C.M. (CCH) 1134; T.C.M. (RIA) 84087; February 23, 1984. William J. Lehrfeld and Leonard J. Henzke, Jr., for the petitioner. Joan R. Domike, for the respondent. FEATHERSTON
MEMORANDUM OPINION FEATHERSTON, Judge: This is an action for declaratory judgment under section 7428. [1] At issue is petitioner's status as a tax-exempt religious organization under section 501(c)(3). In order to resolve that issue, we must determine: (1) Whether petitioner was operated exclusively for exempt purposes; and (2) Whether *588 any part of petitioner's net earnings inured to the benefit of private individuals. Petitioner states that the question whether it is a church within the meaning of sections 170(b)(1)(A)(i) and 509(a)(1) is also before the Court. [2] We do not agree. That question has not been briefed by respondent and was not raised in petitioner's pleadings. Apparently in recognition of this defect, petitioner moved to file an amended petition raising the issue of its status as a church within the statutory meaning of the term. That motion, however, was denied. Accordingly, the matter is not properly before the Court and will not be considered. Peoples Translation Service v. Commissioner,72 T.C. 42, 51-52 (1979); Frentz v. Commissioner,44 T.C. 485, 490-491 (1965), affd. 375 F.2d 662 (6th Cir. 1967); Williams v. Commissioner,35 T.C. 685, 688 (1961); cf. Rule 41(b)(1). *589 On June 4, 1979, petitioner filed an application for recognition of its exempt status under section 501(c)(3) with the Internal Revenue Service Center, Ogden, Utah. After a proposed adverse ruling by respondent and a protest to that proposed ruling by petitioner, a final adverse ruling was issued by respondent on January 30, 1981. Petitioner, having exhausted its administrative remedies as required by section 7428(b)(2), now brings this action for a declaratory judgment requesting the Court to overrule respondent's denial of tax-exempt status. The parties have filed with the Court the entire administrative record in this case and have stipulated to its genuineness. Our decision will be based upon the assumption that the facts as represented in the administrative record as so stipulated are true. Rule 217(b)(1). 1. Basic Facts
(a) Organization
Petitioner is a successor to the Polarity Health Institute (PHI), a for-profit corporation which was owned by two married couples, Jefferson and Sharon Campbell and William and Heather Leichnitz. PHI was founded in order "to promote the understanding of energy and its function in the human body as developed by Dr. Randolph *590 Stone (a philosopher, Chiropractor, and Osteopath who retired in 1973)." PHI offered courses in "polarity health education," teaching Dr. Stone's theories and techniques and instructing those who wished to become practitioners of his methods. The record shows: The original emphasis of the Institute was on working with the body and emotions and on preparing people to teach the work. As the Institute evolved, the emphasis of its teachings gravitated increasingly to a belief in God and an acceptance of His law as the key to a happier life. At the same time, those involved with the Institute came to understand that doing the work for profit or for thought of personal gain was contradictory to the philosophy of service being taught. To facilitate the change to nonprofit operations, petitioner was incorporated on June 20, 1978, as a nonprofit corporation under chapter 24.03 of the Revised Code of the State of Washington. Petitioner was originally incorporated as "Alive: The Church of Harmonious Living." [3] On February 14, 1979, its name was changed to "The Alive Fellowship of Harmonious Living." [4]
*591 When petitioner was organized in 1978, it purchased most of the assets of PHI, consisting primarily of real and personal property located at Doe Bay, Orcas Island, Washington. [5]PHI's operations were wound up by December 1979. By that time, all of its assets had been sold to petitioner or to unrelated third parties. Petitioner's articles of incorporation provide that its purpose is: "To operate exclusively for religious, charitable, or educational purposes, within the meaning of Section 501(c)(3)." The articles provide further that: The corporation shall have no capital stock, and no part of its net earnings shall inure to the benefit of any trustee, officer, or member of the corporation, or any private individual. (b) Membership
As outlined in petitioner's bylaws, membership in petitioner was divided into two classes of members, designated "General Members" and "Clergy." Broadly speaking, the general members were the students of petitioner's programs and the clergy [6] were the teachers. General membership was open to *592 any person over the age of 18 who indicated in writing a desire to learn petitioner's teachings. General members were eligible to progress in petitioner's "orders"--Novice, Practitioner, and Counselor. The requirements for membership in each order were established by the Fellowship Council. The clergy was also divided into three classes: Staff Counselors, Staff Ministers, and Ministers. Staff Counselors and Staff Ministers were required at the time of their "ordination" to divest themselves of all assets except personal belongings [7] and thereafter to refrain from accumulating substantial personal wealth. They were to be supported by the Fellowship "on as equal a basis as is possible considering the needs, duties and responsibilities of each." The Staff Counselors' and Staff Ministers' divestitures could be in favor of "whomsoever *593 they choose." In practice, most chose to donate their assets to petitioner. In fiscal 1979, contributions from 21 separate donors totaled over $155,000. Individual contributions ranged from $111 to $41,443. Unlike Staff Counselors and Staff Ministers, Ministers were not required to divest themselves of their assets. They were required to devote themselves exclusively to their ministerial duties and were entitled, depending on their need, to receive room, board, and salary from the Fellowship. (c) Doctrines and Teaching
In order to remain in good standing, clergy members were required to demonstrate their "continuing commitment" to petitioner's "Guidelines for living." These guidelines are: To eat neither meat, fish or fowl of any kind, nor eggs, nor anything containing their essence. To abstain from the use of alcohol, mind-expanding drugs and all tobacco products. To abstain from using one's own psychic energies to consciously affect or heal others. To abstain from receiving hypnosis or using hypnosis on others. To engage in sexual relations only with one's legally married spouse. To lead a moral *594 life. To hold a positive outlook on life. Petitioner's doctrines are based on a belief that "all life is vibration, animated by energies whose source is the Creator." Petitioner states that "the core of Polarity theology" is that-- Everything is dual. Everything has its poles; everything has a pair of opposites; like and unlike are the same; opposites are identical in nature, but different in degree; extremes meet; all truths are but halftruths; all paradoxes may be reconciled. Petitioner's tenet is that this principle explains God, man's relationship to God, and the nature and functioning of the intellectual, physical, and emotional aspects of man, and the necessity for man's service to others. In order to promote "greater current flow and balance" in the body, petitioner conducts classes in "Polar Energetics." "Awareness," a counseling technique developed by Jefferson Campbell, is used by petitioner to-- [enable] the individual to look into his own mind and to root out those diseased parts that have caused depression, insecurity, confusion, loneliness or unhappiness that has led to imbalances elsewhere in his body. In one of its published pamphlets, *595 petitioner describes Alive polarity therapy as-- A WHOLISTIC, INTEGRATED SYSTEM. It brings understanding and unity to many fields of inquiry which may have seemed fragmented or unrelated. * * * Petitioner's headquarters at Orcas Island serves as its major base of operation, although it has set up "outreach centers," also called "Fellowship Houses," in Mill Valley and Santa Barbara, California, and in Seattle, Washington. Alive owns its main facilities on Orcas Island and rents the other offices. In these facilities, petitioner offers programs of various lengths ranging from 3 days to 6 months. All programs at Orcas Island are advertised as residential programs involving experiencing the teachings and doctrines of the Fellowship for the purpose of practical application in life. The programs offered at the outreach centers differ primarily in that they are nonresidential; the material taught is the same. Petitioner offered three main programs of instruction, the Basic Program, the Practitioner Program, and the Counselor-Minister Program. The "Basic Program" lasted 7 weeks and included classes in "theoretical understanding and practical application of energy theory in Manipulations, *596 Awareness, PolarEnergetics, Vibrations of Foods, and Family Life." The brochure which described the program also pointed out that-- [a]dditional hours are spent in activities such as sauna, ocean swimming, sports, weekend entertainment, field trips, and enjoying the delicious food served at the Institute. The next level of instruction offered by petitioner was the Practitioner Program, which lasted 10 weeks and was designed to "[take] students to an even deeper level of understanding, acceptance and self-respect." Church members who attained the status of practitioner were expected to "maintain a lifetime commitment to the Guidelines and the form of the Church." They had the church's approval to offer instruction in polarity to other church members for compensation. The third level of instruction offered by petitioner was the Counselor-Minister Program, which lasted 6 months and was described in one brochure as "the culmination of many years of dreams and work on the part of the Institute." Those who successfully completed this program were appointed Counselors of the Church and were entitled to conduct "Member's group Awareness sessions" and other classes for compensation. *597 From the ranks of the Counselor, "[t]hose special few who have demonstrated the maturity and know-how to operate an ALIVE Church in affiliation with the mother Church" were ordained as Ministers of the Church. During 1978 and 1979, tuition was $1,500 for the Basic Program, $1,700 for the Practitioner Program, and $3,300 for the Counselor-Minister Program. Petitioner states that its goal is eventually to offer the programs without charge. The arrangements described above, under which graduates of the various programs were authorized to teach what they had learned to other students for a fee, proved unsatisfactory. One of petitioners's members describes the problems that arose in the following terms: It soon became clear that supervising the teaching of these various orders was a difficult task; many altered the teachings to suit their own needs or desires; many found it difficult to maintain their commitment to the Guidelines--a requirement deemed absolutely necessary by the Church--and there was an apparent conflict between the desire to give service to others through teaching the Church's understandings and the need to support oneself economically by charging for the teaching *598 services. The most vulnerable link in the chain was the Novices, who had had the least amount of training, and this Order was discontinued after only a few months. Only one Minister Program was ever held and almost all of those going through that program came onto staff at its conclusion. No outside Ministers were ever appointed and only two or three outside (non-staff) Counselors were appointed. The main outreach-teaching arm was therefore the Practitioners. The great majority of those who took the Practitioner Program and did not come onto staff shortly thereafter, maintained their association as Practitioners for some period of time and then went their own way. One of the main reasons for this was the difficulty of being a living example of our teachings and living in accordance with the Guidelines while being away from the supportive atmosphere of the Fellowship. * * * In order to remedy these perceived defects, petitioner's training programs were reformed. In 1980-- the entire Practitioner format was modified to do away with Practitioners as they had existed up until that time--essentially independent teaching representatives of the Fellowship--and to bring people *599 with that motivation much more within the framework of the Fellowship.
The changed Practitioner Program, as it now exists, is in reality a blending of the old Practitioner and Minister Programs. It provides for a minimum three-year commitment by the Practitioner. The first year, for which he pays $7,500.00, is for in-depth study and practice of the teachings of the Fellowship. The next two years are devoted to service through the Fellowship at one of its locations in whatever capacity may be assigned. During this two-year period the Practitioner pays nothing and is supported by the Fellowship the same as if he were on staff, including the same allowance, when paid. There is, however, no requirement for coming to zero, and at the end of the period of service he is free to leave. In order to discourage people from going through this program in order to learn a "trade", Practitioners must make a commitment that if they cease to be Practitioners they will not teach any of the things they have learned from the Fellowship, for compensation, for at least two years. The Practitioner Program is currently limited to 12 Practitioners a year for both 1980 and 1981. Both of these programs *600 are full. (d) Staff Members and their Compensation
On October 31, 1979, there were 59 staff members, whose duties, in addition to teaching petitioner's courses, included counseling, graphic arts, office management, kitchen help, public relations, legal advice, nursing, gardening, plumbing, construction, and maintenance. One of petitioner's staff members described the staff's working hours, and the manner in which they were supported by Petitioner, in the following terms: Staff members serve in whatever capacity and at whatever location they are assigned by the Fellowship. Men are expected to work scheduled time of at least 9 hours per day, 6 days per week. Women work 8 hours per day and women with children work 7 hours per day, 6 days per week. Anyone may be called upon to give extra service as the need arises. There is an understanding that part of being on staff is being devoted to giving service through the Fellowship and therefore all will work together as needed to accomplish the work to be done. All staff must attend Fellowship meetings held at least once a week. Staff are provided with room, board, medical care and whatever other necessities they *601 may have. They receive an allowance that is paid on a "cash available" basis. This allowance is currently averaging about $20.00 per person per month. Individual allowances for 1979 totalled an average of about $350.00 per person. Allowances are used for personal expenses, treat and entertainment. A staff member needing an article of clothing, for example, and having no spending money, would request of the Fellowship that he be provided with it. Inquiries might first be made to determine if such an item was available and not being used by another staff member. If not and the item was deemed necessary, the individual would be told to purchase the item at Fellowship expense. [8]
*602 Petitioner also paid certain extraordinary expenses for its staff. For example, in 1979, it paid the medical expenses of childbirth incurred by nine families on its staff. It also paid part of the travel expenses incurred by the two children of staff member David Commons in flying between Los Angeles, where they live with their mother, Commons' former wife, and Orcas Island. Petitioner has also paid $500 as a retainer for an attorney to represent Commons in a child custody action. Commons was himself an attorney in private practice before becoming a member of Alive. As of 1980, the residual income of his former practice had been sufficient for him to pay his child support obligations, but it was anticipated that petitioner would pay these expenses directly when the residual income tapered off. Petitioner has also followed a policy of assuming all liabilities of individuals who join its staff. Total liabilities assumed as of September 1980 amounted to between $70,000 and $80,000. [9] Petitioner explains that: This policy is necessary since compensation for services after coming on staff is often inadequate for satisfying commitments made during a staff member's former lifestyle. *603 Staff members are not entitled to any set share in petitioner's assets upon leaving the Fellowship. An informal policy, which was applied in the only such case which arose, provided that departing staff members who had been with the Fellowship for at least one year would be given $2,000 in order to defray their initial living expenses while re-establishing themselves in the outside world. In September 1980, the Orcas Island facility housed 45 members of petitioner's staff, 15 "service people" who were unable to pay for petitioner's programs but instead worked in exchange for being allowed to participate, and four dependents. The staff at Orcas Island live in small cabins or trailers on the grounds. Program participants live in cottages and dormitory rooms. The three Fellowship *604 Houses at the outreach centers also provide live-in facilities for resident staff. Three or four couples live in the Fellowship Houses and are supported by petitioner on the same basis as the staff on Orcas Island. There are no residential facilities for program participants in the Fellowship Houses.
(e) Finances
Petitioner's financial support was derived from the tuition for its various programs, from the sale of books and tapes containing its teachings, and from donations from its members. For the fiscal year ended May 31, 1979, petitioner's income from its operations, not including members' donations, exceeded its expenses by about $16,000. For the fiscal year ended May 31, 1980, petitioner's operations resulted in a net loss of $251,439. [10] This loss was partially offset by donations from members. *605 2. Standards for Exemption
Section 501(a) provides generally that organizations described in section 501(c) shall be exempt from taxation under subtitle A of the Internal Revenue Code. One class of exempt organizations is described in section 501(c)(3), in pertinent part, as follows: (3) Corporations * * * organized and operated exclusively for religious * * * purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *. It is as a section 501(c)(3) religious organization that petitioner claims tax-exempt status.
We note initially that respondent does not question the sincerity of the beliefs of petitioner's members, nor has he argued that those beliefs are not "religious" within the meaning of section 501(c)(3). In fact, in respondent's proposed findings of fact he uncritically repeats petitioner's characterization of itself in the following terms: [A]lthough the specific beliefs may differ somewhat from traditional religions, * * * [petitioner's members] are no different from any people for whom a deep religious conviction is the central motivating force in life. The Court, therefore, accepts as *606 an agreed fact that petitioner is a religious organization. Respondent has, however, denied petitioner's request for exempt status on two narrower grounds. He has determined that: (1) Petitioner was not operated "exclusively" for an exempt purpose, and that (2) part of petitioner's net earnings inured to the benefit of private individuals. It is only these grounds for denial that we must consider here. Houston Lawyer Referral Service v. Commissioner,69 T.C. 570, 573 (1978). For the reasons discussed below, we conclude that neither ground for denial is valid. Accordingly, we hold that petitioner qualifies as a tax-exempt organization under section 501(c)(3). [11]
*607 3.The Operational Test
In order to qualify for exempt status, an organization must be "operated exclusively" for exempt purposes. [12] The regulations provide that (sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.): An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. The Supreme Court, interpreting language contained in section 811(b)(8) of the Social Security Act and identical in relevant respects to that of section 501(c)(3), has stated that the "presence of a single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." Better Business Bureau v. United States,326 U.S. 279, 283 (1945); Copyright Clearance Center v. Commissioner,79 T.C. 793 (1982). *608 It is not the nature of an organization's activities, but rather the purpose towards which they are directed which determines whether the operational test is satisfied. The fact that an organization's activities constitute a trade or business does not, of itself, disqualify that organization under section 501(c)(3), provided the activities serve an exempt purpose. The critical inquiry is whether the primary purpose of petitioner's activities was an exempt one, or whether it was a nonexempt one such as operating a commercial business to produce net profits for petitioner. B.S.W. Group, Inc. v. Commissioner,70 T.C. 352, 356-357 (1978). Respondent contends that petitioner is not operated solely for exempt purposes, but that it is operated in substantial part in furtherance of a commercial purpose. He argues that petitioner-- sells ALIVE Polarity Therapy as its sole activity, which it operates in a manner which is not materially distinguishable from that of a business ordinarily carried on for profit. The principal source of its income is the fees it charges for its services. The donations it has received have come from its organizers and staff, that is, from *609 those whom it supports. Its activities consist of conducting a recreational, health, counseling, group therapy business which combines a variety of businesses ordinarily carried on commercially for profit. It competes with summer camps, recreational lodges, health spas, counseling groups, doctors or psychologists, osteopaths, chiropractors and others practicing similar professions, birth control and natural childbirth clinics, and natural foods or vegetarian classes and stores, to suggest a few. The operational test, however, is not based directly on the organization's activities or the manner in which they are carried out, but on the purposes which the activities serve. Aid to Artisana, Inc. v. Commissioner,71 T.C. 202, 211 (1978).[13] The activities themselves and the manner in which they are conducted are relevant, however, insofar as they offer insight into the underlying purpose. As this Court stated in Christian Manner International v. Commissioner,71 T.C. 661, 668 (1979), after first deciding that the primary activity of the organization therein concerned was the sale of its founder's books-- we must next determine whether that activity *610 was in furtherance of an exempt or a nonexempt purpose, or both. If the activity was engaged in to further a nonexempt purpose only, the exemption must be denied. If it was engaged in to further an exempt purpose only, petitioner would qualify as an exempt organization under section 501(c)(3). If the activity was engaged in to further both an exempt and nonexempt purpose, we must decide whether the nonexempt purpose was sufficiently substantial to deny the exemption or was so incidental to the exempt purpose as not to disqualify petitioner for exemption. We must make a similar determination in the present case. As we noted in Christian Manner International v. Commissioner,supra at 668, "* * * what purposes the activity or activities engaged in support are questions of fact." Viewing the facts of this case in the light of the applicable standards, we conclude that petitioner was operated "exclusively" *611 to enable and encourage its members to follow its doctrines and to teach those doctrines to those who expressed an interest in learning them. As noted above, respondent does not dispute that those doctrines were "religious" within the meaning of section 501(c)(3). We do not find persuasive respondent's argument that petitioner's activities are similar to those of "summer camps, recreational lodges, health spas" and similar organizations. Respondent advanced this argument successfully in Schoger Foundation v. Commissioner,76 T.C. 380 (1981), but we find that case to be distinguishable from the present one. The taxpayer in Schoger Foundation was a corporation which owned a facility called Christ Haven Lodge and located in the mountains of Teller County, Colorado. The taxpayer's claim of entitlement to tax-exempt status was based on its characterization of itself as "existing primarily to provide a place for Christian families 'to rest and become reacquainted.'" 76 T.C. at 382. The Court found, however, that the recreational facilities and activities offered at the lodge, were "comparable to a resort's activities." 76 T.C. at 387. *612 The lodge provided no set program or schedule of activities, "religious or otherwise," and the Court held that the taxpayer had failed to carry its burden of proving that "the lodge was operated primarily for an exempt religious purpose and that the recreational and social activities at the lodge were only incidental to that religious purpose and less than substantial." 76 T.C. at 389. In the present case, by contrast, we find that petitioner has succeeded in demonstrating that its members devoted their time on Orcas Island and at the outreach centers to a structured program devoted to instruction in petitioner's concededly religious doctrines and that those aspects of the programs which can be characterized as social or recreational were merely incidental to the programs' primary purpose. We also note that, in Schoger Foundation, the Court did not hold that no organization operating a retreat facility in an idyllic setting could qualify under section 501(c)(3). On the contrary, it specifically stated that (76 T.C. at 389): In a proper factual case, the operation of a lodge as a religious retreat facility would no doubt constitute an exempt religious *613 purpose under section 501(c)(3), and the presence of some incidental recreational or social activities might even be found to be activities to further or accomplish that exempt purpose. Respondent compares petitioner's operations with those of the organization concerned in est of Hawaii v. Commissioner,71 T.C. 1067 (1979), affd. per order 647 F.2d 170 (9th Cir. 1981). That case is distinguishable from the present one. In est of Hawaii, the organization claiming tax-exempt status as a section 501(c)(3) educational organization conducted seminars in awareness and interpersonal communication under licensing arrangements with for-profit corporations. This Court agreed with respondent's characterization of the arrangement as a franchise system which was operated for the benefit of the for-profit corporations and held that the purportedly tax-exempt organization's affiliation with this system tainted it with a substantial commercial purpose. est of Hawaii v. Commissioner,supra at 1080. In the present case, by contrast, petitioner has no such involvement with any concededly for-profit corporation. In this regard, respondent also *614 cites Foundation for Divine Meditation, Inc. v. CommissionerT.C. Memo. 1965-77, affd. in part and revd. and remanded in part sub nom. Parker v. Commissioner,365 F.2d 792 (8th Cir. 1966). That case, too, is distinguishable from the present one. The principal activity of the organization in that case was "the publication and distribution of numerous booklets, reports, pamphlets, newspapers and other printed materials." This Court found that many of these materials were "of a clearly nonreligious nature" and that financial gain was "the end to which the activities were directed." This is not true in petitioner's case. On the contrary, petitioner engaged in no substantial activity which was not directed to the spread of its doctrines to those who had expressed an interest in them. As noted above, respondent has not challenged petitioner's contention that those doctrines were "religious" within the meaning of section 501(c)(3). Respondent emphasizes that an organization will not be found to be organized exclusively for an exempt purpose unless it serves a public rather than a private interest. Thus, an exempt organization may not be organized or operated for *615 the benefit of private interests such as its creator or his family, or its shareholders. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Respondent argues that petitioner fails to satisfy this requirement because it is operated for the benefit of its members rather than for the public at large. The requirement that an exempt organization be operated for public rather than private benefits is but another way of requiring that it be operated exclusively for exempt purposes. Western Catholic Church v. Commissioner,73 T.C. 196, 213 (1979), affd. per order 631 F.2d 736 (7th Cir. 1980). The issue is one of fact. Retired Teachers Legal Fund v. Commissioner,78 T.C. 280 (1982.) In this regard, respondent emphasizes the fact that, at one time, those members who had attained the rank of practitioner were authorized by the Fellowship to teach petitioner's doctrines and methods to outsiders for compensation. He quotes petitioner's statement in one of its publications that the Fellowship "allow[s] one to achieve the much-sought-after goal of earning his own livelihood through service to mankind." As recited above, petitioner's governing *616 body itself concluded that the old arrangement, whereby its graduates taught the Fellowship's doctrines to others and charged fees for their services, was unsatisfactory. Accordingly, the practitioner program was modified; departing practitioners agreed not to teach what they had learned at the Fellowship for compensation for a period of 2 years after leaving. We add that the clergy of many religious organizations which concededly qualify under section 501(c)(3) support themselves with the compensation they receive for teaching the doctrines of their respective faiths. So long as that compensation is not excessive in relation to the work performed, we do not think it requires a conclusion that the organization serves private rather than public interests. Respondent also argues that the membership in general has "a lively economic interest in the commercial success of petitioner," because most of them contribute their assets to petitioner on becoming members and-- If it does not succeed, or if it does not gross enough in any period to support them, those contributed assets are to that extent dissipated. Here, too, respondent has failed to show how petitioner is different *617 in this respect from many concededly exempt organizations (such as privately endowed colleges, hospitals, and churches), whose members and employees would be adversely affected should inadequate finances force those organizations to disband. Neither in those cases nor in this one does the fact that the organization's members are interested that it should continue in existence lead to the conclusion that the organization is operated for the members' interests. For the reasons stated above, we hold that petitioner satisfies the operational test of section 501(c)(3). 4. Private Inurement
Section 501(c)(3) also requires, as a condition of exempt status, that "no part of the net earnings" of the organization inure to the benefit of "any private shareholder or individual." The forbidden inurement may take the form of a cash dividend. It may also take less obvious forms such as the provision of goods and services to the organization's members, [14] the payment of excessive rent for the use of property, [15] or the payment of excessive salaries for services rendered. [16] By the same token, the payment of reasonable compensation for services rendered does not constitute the forbidden *618 inurement. [17]
The determination whether compensation is reasonable or excessive is made by reference to criteria similar to those which apply in determining whether a salary payment made by a nonexempt organization is deductible under section 162. Enterprise Railway Equipment Co. v. United States,142 Ct. Cl. 192, 200-201, 161 F.Supp. 590, 595 (1958). We have observed that "[o]ne factor to consider [in determining the reasonableness of compensation] is whether comparable services would cost as much if obtained from an outside source in an arm's-length transaction." B.H.W. Anesthesia Foundation v. Commissioner,72 T.C. 681, 686 (1979). Applying that standard to the present case, and considering the meagre benefits received by petitioner's members *619 in return for the full-time services that they performed, we find that the benefits were within the bounds of reasonable compensation for those services. Accordingly, there was no inurement of petitioner's net earnings to any private individual within the meaning of the statute. See Golden Rule Church Association v. Commissioner,41 T.C. 719, 731 (1964), holding that subsistence payments to student ministers did not constitute the inurement of private benefit, and Saint Germain Foundation v. Commissioner,26 T.C. 648, 658-659 (1956), reaching a similar conclusion with regard to the living expenses of the staff of the petitioner organization, which the organization paid in lieu of salaries and which this Court found to be "reasonable in every respect" [18]
*620 Respondent himself concedes that "all of * * * [petitioner's] staff work full time for the Fellowship," and describes the standard of living provided under petitioner's compensation scheme as "modest." As described above, the term "modest" is a generous evaluation of the subsistence and small cash allowances provided the staff members. Nonetheless, respondent argues as follows that, in view of the goods and services furnished by petitioner to its members under this communal plan: It is clear * * * that the net earnings of petitioner inure to the benefit of staff members. Petitioner's budget shows that all expenditures, after deduction for expenditures connected with its commercial activity, were for the benefit of its staff. The funds are used to provide the necessities of life and other personal conveniences to its staff. Benefits are not distributed in accordance with work done. By petitioner's own statements, the benefits are divided equally among the staff or according to staff needs. Thus, the benefits are not provided in the measure of reasonable compensation for services performed. Sharing the common treasury demonstrates that the benefits are not being provided as *621 compensation, because payments are not made in relation to the value of services rendered to petitioner by its staff. Petitioner serves as a cooperative venture limited to its staff. Petitioner's financial operation is in reality structured to distribute its net earnings, and nothing in the record shows that petitioner's financial arrangement has any religious significance.* * * We do not agree with respondent's conclusion that, because some of the benefits received by petitioner's members were based on the member's needs rather than on the value of the services performed, the benefits were not in the nature of compensation. The record demonstrates that everyone who received benefits from petitioner was required to work for them, and in no case do we find that benefits were received which exceeded the value of the services performed. Petitioner's unconventional method of determining the amount of benefits received by each member does not change the nature of the benefits as compensation. Respondent's position is that, because some members' needs are greater than those of other members, those members receive more benefits in proportion to the work done than the other members. *622 This inequality, respondent argues, is uncharacteristic of compensation, leading him to conclude that the benefits should not be so described. We believe, however, that this inequality is merely superficial. While the benefits were unequally distributed due to the varying needs of the members, each member had the same potential claim upon petitioner's resources in time of need. [19] The arrangement is similar to one in which an employer pays all of his employees the same wage, but maintains an insurance policy for them covering certain contingencies which their basic wage would be inadequate to meet. It would not constitute unequal treatment if benefits under the policy were paid to employees who had a claim, but not to others who did not. In support of his position, respondent cites Hofer v. United States,64 Ct. Cl. 672 (1928). In Hofer, the members of a religious community formed a South Dakota corporation named the Hutterische Society. The articles of incorporation provided that the property of the members would be transferred *623 to the corporation and would be "owned, used, occupied, and possessed by said corporation for the common use, interest, and benefit of each and all of the members thereof." 64 Ct. Cl. at 679. The property transferred apparently consisted primarily of the assets of the members' farms. During the year in question, 1917, the corporation earned a net profit from its farming and other operations of $145,969.50. The Court of Caims found that (64 Ct. Cl. at 674): The income of the corporation was used to support its members and their families, to purchase implements, facilities, and to maintain its land and buildings, and the balance of its funds was invested in the purchase of additional lands.
The court concluded that the corporation's structure led to the inurement of private benefit. It stated (64 Ct. Cl. at 684): [T]he facts show that the income as well as the property was in large degree held for the common use and benefit of its members to be used for their support and maintenance, and also for the support, maintenance, and education of the heirs of deceased members. Certainly it may not be said that no part of the net income inured *624 to the benefit of any individual. It was for the benefit of its members. Nor can it be said that such a corporation was operated exclusively for a religious purpose within the meaning of the exemption clause in the act mentioned. In a related case, the same organization was denied exempt status for its taxable year 1919 by the Board of Tax Appeals on the grounds that it had failed to demonstrate that it was operated exclusively for religious purposes. Hutterische Bruder Gemeinde v. Commissioner,1 B.T.A. 1208, 1212 (1925). Those cases are distinguishable from the present one. The court in Hofer did not discuss the question whether the benefits received by the members of the organization were reasonable in relation to the services that the members performed. In the present case, we have considered that relationship and found that it was reasonable. Our conclusion that there was no inurement of private benefit in the present case is, therefore, not in conflict with the court's finding that there was such inurement in Hofer, because our finding is based on a factor which the Hofer court did not discuss. [20] Neither is our finding in this regard *625 inconsistent with the ruling of the Board of Tex Appeals in Hutterische Bruder Gemeinde. The Board did not reach the inurement issue in that case but instead based its holding on the conclusion that the large-scale farming operations therein concerned were not operated exclusively to further an exempt purpose. Respondent's argument that the petitioner in the present case was not operated exclusively for exempt purposes has been considered and rejected above. *626 We note that petitioner's operations lost money during the years in question, and that even the members' donations did not entirely offset that loss. [21] Should petitioner's activities one day generate net profits, its disposition of those profits will, of course, be subject to scrutiny and its exempt status subject to review at that time. *627 To reflect the foregoing, Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rules references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
2. The Internal Revenue Service's final adverse ruling letter, which states the issues considered at the administrative level, contains the following: Our adverse ruling was made for the following reason(s): You are not operated exclusively for charitable, educational or religious purposes within the meaning of section 501(c)(3) of the Code. You are operated in furtherance of a substantial commercial purpose. Also, your net earnings inure to the benefit of your members. Furthermore, you serve private rather than public interests. The question of petitioner's status as a church within the meaning of the Code sections cited above is related to but not identical with the question whether it qualifies as a sec. 501(c)(3) religious organization. See generally Church of the Visible Intelligence that Governs the Universe v. United States, 83-2 USTC par. 9726, 53 AFTR2d 84-406 (Cl. Ct. 1983); American Guidance Foundation v. United States,490 F.Supp. 304↩ (D.D.C. 1980), affd. per order (D.C. Cir., July 11, 1982).
3. "Alive" is an acronym for "A Living Inner Vitality Experience." ↩
4. The name was subsequently changed to "Alive Polarity Fellowship," but for simplicity's sake we will continue to refer to petitioner as the "Alive Fellowship of Harmonious Living," the name used in its pleadings and briefs.↩
5. The Orcas Island facility is described in a film produced by petitioner as "over 50 acres of firs and cedars by the edge of the sea."↩
6. In using terms such as "clergy" and "church" in describing petitioner and its operations, we are merely following petitioner's own usage for the sake of simplicity. We imply no holding with regard to the question whether petitioner is a "church" within the statutory sense of the term. As stated in text above, that issue is not before the Court.↩
7. This divestiture was called "coming to zero."↩
8. The cash allowances referred to above were described in one of petitioner's responses to respondent's inquiries as follows: All staff nominally receive an allowance of $100 per month; children receive half of this amount. Allowances are paid more often to those in Fellowship Houses (which are located in cities) or to those travelling away from the Orcas Island location, in recognition of the fact that those people who are travelling or in cities will have greater incidental expenses than those living in the relatively modest environment at the main facility.
Allowances are paid to staff resident at Orcas Island only when there is sufficient cash flow over and above projected expenses and capital expenditures for the month. In 1979 Orcas Island staff received a total of $326.98 in allowance each for the year. No particular reference to retained earnings is made in paying allowances.↩
9. Among the debts assumed by petitioner were: ↩
Staff Member(s)
Amount
Chester and Geraldine Brown
$6,200.00
Jim and Anne Eklund
500.00
Joseph and Kathi Fox
7,385.00
Terry and Alexandra Gelatt
7,200.00
Michael and Jaylene Hogan
2,798.50
Bruce and Margaret Peters
5,577.46
Jefferson Campbell
2,475.06
Steven Jungerberg
1,200.00
Sam Buck
2,947.41
Neil Pinholster
1,500.00
10. The 1980 loss was broken down into the following amounts in petitioner's financial statements: Income from operations
$ 644,732 Other income
17,458 Loss on disposal of assets
(57,544)
Cash expenses
(818,690)
Depreciation and amortization
(37,395)
Net loss
$ (251,439)
The cash expenses of $818,690 included the living expenses of the members which were paid under petitioner's communal plan, as well as other expenses of conducting its programs and maintaining its property. The largest single expense was $229,642 for food.↩
11. We note that our holding relates only to the organization now before the Court. Should the qualification under sec. 501(c)(3) of any related organization later be at issue, that matter will have to be resolved separately. See, e.g., Hawbaker v. Commissioner,T.C. Memo. 1983-665, and Murphy v. Commissioner,T.C. Memo. 1983-59, among the numerous cases holding that organizations related to the Universal Life Church, Inc., of Modesto, California, were not affected by the tax exemption granted to the Modesto organization in Universal Life Church, Inc. v. United States,372 F.Supp. 770↩ (E.D. Cal. 1974).
12. It must also be "organized" exclusively for exempt purposes, but respondent does not contend that petitioner fails the organizational test.↩
13. See also A.A. Allen Revivals, Inc. v. Commissioner,T.C. Memo. 1963-281↩, wherein this Court stated that "profitable or even competitive activities in furtherance of petitioner's religious purpose do not affect its right to exemption."
14. Spokane Motorcycle Club v. United States,222 F.Supp. 151↩ (E.D. Wash. 1963). 15. Texas Trade School v. Commissioner,30 T.C. 642, 647 (1958), affd. 272 F.2d 168↩ (5th Cir. 1959). 16. Mabee Petroleum Corp. v. United States,203 F.2d 872↩ (5th Cir. 1953). 17. World Family Corp. v. Commissioner,↩ 81 T.C.     (1983).
18. Compare Bethel Mennonite Church v. Commissioner,80 T.C. 352↩ (1983), on appeal (7th Cir., July 11, 1983), in which the petitioner organization was held not to qualify under sec. 501(c)(3) because of a medical aid plan which it operated for its members. This Court found that the administration of the plan constituted a substantial nonexempt activity and, accordingly, that the organization was not operated exclusively for exempt purposes. That case is distinguishable from the present one, however, because the benefits under the health plan therein concerned were not received by the members as compensation for services rendered to the organization.
19. Respondent has not argued that preference was given to any particular member in the administration of petitioner's assets.↩
20. For the same reason, Beth-El Ministries, Inc. v. United States, an unreported decision, 79-2 USTC par. 9412, 44 AFTR2d 79-5190, (D.D.C. 1979), is distinguishable from the present case. There, too, the court held that the use of the resources of the organization therein concerned to provide for its members under a communal plan constituted the inurement of private benefit, but, as in Hofer v. United States,64 Ct. Cl. 672 (1928), the question of the reasonableness of the benefits received by the members in relation to the services they performed was not considered. See also New Life Tabernacle v. CommissionerT.C. Memo. 1982-367, wherein this Court held that the petitioner organization had failed to establish that payments under its communal plan did not constitute the forbidden inurement. The Court commented that: Although the administrative record provides us with some information as to what personal services are performed in the aggregate, there is almost no information that would enable us to quantify the services or to determine some appropriate rate at which the services may be valued, so as to enable us to determine whether the amounts spent would be reasonable as compensation in the aggregate. We cannot determine whether the amounts spent for any individual, or for all 12 "regular members", would be reasonable. In the present case, by contrast, we find that the record demonstrates that the benefits received by petitioner's members were↩ reasonable in relation to the services performed.
21. The parties have not raised, and we do not reach the question whether petitioner had "net earnings" within the meaning of sec. 501(c)(3) in spite of having no net profits in the usual economic sense of the term. We note, however, that, while the Code and regulations leave the term "net earnings" undefined, the courts have held that it "may include more than the term net profits as shown by the books of the organization or than the difference between the gross receipts and disbursements in dollars." Northwestern Municipal Ass'n v. United States,99 F.2d 460, 463 (8th Cir. 1938); Harding Hospital, Inc. v. United States,505 F.2d 1068, 1072 (6th Cir. 1974). See also People of God Community v. Commissioner,75 T.C. 127, 132-133↩, n. 5 (1980). We need not decide whether petitioner had net earnings in the statutory sense during the years in question because the inurement issue is disposed of by our holding that the benefits received by petitioner's members constituted reasonable compensation for the work they performed.