**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 9 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IHC HEALTH PLANS, INC., on its
own behalf and as successor in interest
to IHC Group, Inc., and IHC Care,
Inc.

          Petitioners - Appellants,

    v.

COMMISSIONER OF INTERNAL
REVENUE,

          Respondent - Appellee.

Nos. 01-9013, 01-9014, 01-9015

---

**APPEAL FROM THE UNITED STATES TAX COURT**
**(Nos. 14599-99X, 14600-99X, 14601-99X)**

---

Douglas M. Mancino (Robert C. Louthian, III, Robert E. Kohn, and David L.
Hirsch, with him on the briefs), McDermott, Will & Emery, Los Angeles,
California, appearing for the Appellant.

Teresa E. McLaughlin, Attorney, Tax Division, Department of Justice (Eileen J.
O'Connor, Assistant Attorney General, and Gary R. Allen, Attorney, Tax
Division, Department of Justice, with her on the brief), Washington, DC,
appearing for the Appellee.

---

Before **TACHA**, Chief Circuit Judge, **HOLLOWAY**, and **EBEL**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

## I. Background[1]

IHC Health Plans, Inc. ("Health Plans"), on its own behalf and as successor in interest to IHC Care, Inc. ("Care") and IHC Group, Inc. ("Group") (collectively "petitioners"),[2] appeals the Tax Court's decision denying petitioners' request for tax exemption under 26 U.S.C. § 501(c)(3). We have jurisdiction to review the Tax Court's decision under 26 U.S.C. § 7482(a)(1). The sole issue presented in this appeal is whether petitioners qualify for tax-exempt status under 26 U.S.C. § 501(c)(3) as organizations operated exclusively for charitable purposes.

### A. The IHC Integrated Delivery System

#### 1. *The formation of IHC*

In 1970, the Church of Jesus Christ of Latter Day Saints ("LDS Church") formed Health Services Corporation, later renamed Intermountain Health Care, Inc. ("IHC"), as a Utah nonprofit corporation. IHC assumed ownership and control of fifteen hospitals previously owned by the LDS Church. In 1975, the LDS Church transferred control of IHC to an independent board of trustees, comprised of persons representative of the community. The Internal Revenue

---

[1] The Tax Court's three opinions set out the facts in greater detail. *See IHC Health Plans, Inc. v. Commissioner*, 82 T.C.M. (CCH) 593 (2001); *IHC Group, Inc. v. Commissioner*, 82 T.C.M. (CCH) 606 (2001); *IHC Care, Inc. v. Commissioner*, 82 T.C.M. (CCH) 617 (2001).

[2] On December 21, 2000, Care and Group both became part of Health Plans.

Service ("IRS") has consistently recognized IHC as a charitable, tax-exempt organization.

### 2. *The formation of Health Services*

As part of its plan to streamline and integrate its provision of health-care services, IHC formed IHC Health Services, Inc. ("Health Services") in 1982 as a Utah nonprofit corporation. In 1983, IHC transferred its hospitals and substantially all the assets necessary to its operation to Health Services. IHC then ceased operating hospitals directly and assumed the role of a parent company, with Health Services as IHC's principal health-care services organization. IHC is Health Services' sole corporate member and the board of trustees of IHC and Health Services are comprised of the same individuals.

At the end of 1999, Health Services operated twenty-two hospitals located in Utah and Idaho, employing approximately 300 primary care physicians and 100 specialist physicians in its Physician Division; it separately employed approximately 120 physicians in its Hospital Division. All Health Services hospitals participated in the Medicare and Medicaid programs for inpatient and outpatient hospital services. Between 1997 and 1999, Health Services provided nearly $1.2 billion in health-care services, without reimbursement, to patients covered by Medicare, Medicaid, and other governmental programs. During that same period, Health Services furnished more than $91 million in free health-care

services to indigent patients.

The Commissioner has recognized Health Services as a tax-exempt organization under section 501(c)(3).

3. *Health Plans, Care, and Group*

In order to further integrate its provision of health-care services, IHC formed Health Plans, Care, and Group to operate as health maintenance organizations ("HMOs") within the IHC Integrated Delivery System. A detailed description of each organization is set forth in Sections I(B)-(D), *infra*.

4. *IHC's role as parent company*

IHC's board of trustees maintained governance power and control over Health Plans, Care, and Group. In particular, IHC had the authority, directly and indirectly, to elect petitioners' boards of trustees. IHC, Health Services, and petitioners shared many of the same corporate officers.[3] IHC conducted petitioners' strategic planning, established their priorities, and attempted to implement their business plans on an enterprise basis. Also, Health Services provided petitioners with centralized management services, including human resources, legal services, public relations, and treasury functions.[4]

---

[3] Health Plans, Care, and Group had identical officers and trustees.

[4] Health Plans provided specialized management and administrative services to Care and Group. Neither Care nor Group had any employees, facilities, or equipment, and both relied on Health Services and Health Plans for

(continued...)

-4-

B.      Health Plans

In 1983, IHC created Health Plans to operate as a state-licensed HMO and preferred provider organization ("PPO").  IHC was the sole corporate member of Health Plans and possessed the power to remove members from Health Plans' board of trustees.  Health Plans offered health plans to small-employer groups, large-employer groups, and individuals, including Medicaid recipients.[5]

In 1999, the population of Utah was approximately 2,130,000.  Health Plans enrolled 416,370 Utahans in its various plans, or approximately twenty percent of Utah's total population.  In 1999, approximately 73,503 Utahans were enrolled in a Medicaid managed-care program.  Health Plans enrolled 35,902 of these individuals, or approximately fifty percent of Utah's total Medicaid population.

In determining premiums, Health Plans applied an "adjusted community rating" for individuals and small-employer groups, adjusting its rates for risk factors such as age and gender.  For large-employer groups, Health Plans used a "past claims experience" method in determining premiums.

In June 1985, the IRS recognized Health Plans as tax exempt under section

---

[4](...continued)
their operational requirements.

[5] Health Plans offered the following eight health plans:  SelectMed, SelectMed Plus, IHC Care, IHC Care Plus, IHC Direct Care, IHC Direct Care Plus, Health Choice, and IHC Access.

501(c)(3). The Commissioner subsequently revoked Health Plans' tax exemption in 1999.

C.   Care

In 1985, IHC formed Care to operate as a "direct contract" HMO, offering federally-qualified health plans in conjunction with Health Plans.[6] Health Plans incorporated Care as a subsidiary because the HMO Act of 1973, 42 U.S.C. § 300e-9, precluded Health Plans from operating a federally-qualified HMO within the same corporate entity in which it operated a state-licensed HMO. Health Plans was Care's sole corporate member, and Care used the same network of health-care providers as Health Plans.

Care only offered its IHC Care health plan to employers with more than 100 employees. Care used an adjusted community rating methodology to determine IHC Care premiums, as required for all federally-qualified HMOs. *See* 42 C.F.R. § 417.104(a)(3), (b). Between 1996 and 1998, Care also offered IHC Senior Care, a Medicare "risk" health plan it has since discontinued.

On April 28, 1986, Care applied for tax exemption under section 501(c)(3). The Commissioner denied Care's request in a final adverse determination letter on

---

[6] The HMO Act of 1973 provided certain marketing advantages to "qualified" HMOs. In particular, under 42 U.S.C. § 300e-9, certain employers were required to offer their employees the option of enrolling in a federally-qualified HMO.

June 16, 1999.

D.     Group

In 1991, IHC formed Group to operate as a federally-qualified "group" model HMO. IHC separately incorporated Group because, at the time of Group's formation, the Health Care Financing Administration[7] prohibited a single corporation from operating two different types of federally-qualified HMOs. Health Plans was Group's sole corporate member.

Group offered its SelectMed health plan exclusively to employers with 100 or more employees. To determine the amount of the premium under the SelectMed plan, Group relied upon an adjusted community rating methodology. Enrollees in the SelectMed plan received a variety of health-care services at no additional charge through Group's "Core Wellness Program." Between 1993 and 1998, Group also offered a Medicare "cost" health plan, IHC Senior Care, which it has since discontinued.

In 1991, Group filed an application for tax exemption under section 501(c)(3). The Commissioner denied Group's request in a final adverse determination letter on June 16, 1999.

E.     The Commissioner's Decision

_____

[7] The Health Care Financing Administration ("HCFA"), an agency of the Department of Health and Human Services, administered the HMO Act of 1973. In 2001, HCFA's name changed to Centers for Medicare and Medicaid Services.

In 1999, the Commissioner concluded that neither Health Plans, Care, nor Group operated exclusively for exempt purposes under section 501(c)(3). The Commissioner alternatively concluded that Health Plans and Care were not entitled to tax-exempt status under section 501(m)(1), which precludes tax-exempt status where a "substantial part of [an organization's] activities consists of providing commercial-type insurance." 26 U.S.C. § 501(m)(1). Accordingly, the Commissioner revoked Health Plans' tax-exempt status, retroactive to January 1, 1987, and denied exemptions to Care and Group.

Health Plans, Care, and Group brought suit in the United States Tax Court, seeking a declaratory judgment reversing the Commissioner's adverse determinations. On September 25, 2001, the Tax Court affirmed the Commissioner's conclusions in three separate opinions. *IHC Health Plans, Inc. v. Commissioner*, 82 T.C.M. (CCH) 593 (2001); *IHC Group, Inc. v. Commissioner*, 82 T.C.M. (CCH) 606 (2001); *IHC Care, Inc. v. Commissioner*, 82 T.C.M. (CCH) 617 (2001).[8] This appeal followed.

## II. Discussion

### A. *Standard of Review*

We review Tax Court decisions "in the same manner and to the same extent

---

[8] The Tax Court did not consider the Commissioner's alternative conclusion under 26 U.S.C. § 501(m)(1).

as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). "Thus, we review factual questions for clear error, legal questions de novo, and mixed questions of law and fact either for clear error or de novo, depending on whether the question is primarily factual or legal." *Consolidated Mfg. Inc. v. C.I.R.*, 249 F.3d 1231, 1236 (10th Cir. 2001) (citation omitted). The appropriate legal standard for determining whether an organization operates for a "charitable" purpose is a legal question, which we review de novo. Whether an organization in fact operates exclusively for a charitable purpose, however, is a question of fact, which we review for clear error. *Florida Hosp. Trust Fund v. C.I.R.*, 71 F.3d 808, 810 (11th Cir. 1996); *Living Faith, Inc. v. C.I.R.*, 950 F.2d 365, 371 (7th Cir. 1991). As the taxpayer claiming entitlement to exemption, petitioners bear the burden of proof. *Living Faith*, 950 F.2d at 370 (citing cases).

B. *Overview of Applicable Law*

"Our analysis must start from the proposition that exemptions from income tax are a matter of legislative grace." *Mutual Aid Ass'n of Church of the Brethren v. United States*, 759 F.2d 792, 794 (10th Cir. 1985) (citation omitted). Thus, we must narrowly construe exemptions from taxation. *Bingler v. Johnson*, 394 U.S. 741, 751-52 (1969) (recognizing the "principle that exemptions from taxation are to be construed narrowly"). In this case, petitioners seek exemption under 26

U.S.C. § 501(c)(3).

Under section 501(c)(3), an organization must meet three requirements in order to qualify for tax exemption: "(1) the corporation must be organized and operated exclusively for exempt purposes; (2) no part of the corporation's net earnings may inure to the benefit of any shareholder or individual;[9] and (3) the corporation must not engage in political campaigns or, to a substantial extent, in lobbying activities."[10] *Hutchinson Baseball Enters., Inc. v. C.I.R.*, 696 F.2d 757, 760 (10th Cir. 1982). In this case, the sole question we must consider is whether Health Plans, Care, and Group operated exclusively for exempt purposes within the meaning of section 501(c)(3).

---

[9] This element can be viewed as a corollary to the public-benefit requirement under section 501(c)(3)'s definition of "charitable," discussed *infra*.

[10] Specifically, section 501(c)(3), in conjunction with section 501(a), provides that the following organizations are exempt from taxation:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

C.    *Whether Health Plans, Care, and Group Operated for a Charitable*

   *Purpose.*

This inquiry requires us to address two basic questions.  First, we must

consider whether the purpose proffered by petitioners qualifies as a "charitable"

purpose under section 501(c)(3).  "The term 'charitable' is used in section

501(c)(3) in its generally accepted legal sense and is . . . not to be construed as

limited by the separate enumeration in section 501(c)(3)."  26 C.F.R.

§1.501(c)(3)-1(d)(2).  An organization will not be considered charitable, however,

"unless it serves a *public rather than a private interest* ."  26 C.F.R. §1.501(c)(3)-

1(d)(1)(ii) (emphasis added). [11]

   Second, we must determine whether petitioners in fact operated *primarily*

for this purpose.  *Geisinger Health Plan v. C.I.R.*, 985 F.2d 1210, 1219 (3d Cir.

1993) (*Geisinger I*).  Under the "operational test" set forth in the IRS regulations,

"[a]n organization will be regarded as 'operated exclusively' for one or more

exempt purposes only if it engages primarily in activities which accomplish one

or more of such exempt purposes specified in section 501(c)(3).  An organization

will not be so regarded if more than an insubstantial part of its activities is not in

---

[11] Although we are not bound by IRS regulations or revenue rulings, we do accord them deference. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 596 (1983) ("[T]his Court has long recognized the primary authority of the IRS and its predecessors in construing the Internal Revenue Code.").

furtherance of an exempt purpose."[12]  26 C.F.R. §1.501(c)(3)-1(c)(1).

In this case, the Tax Court concluded that "the promotion of health for the benefit of the community is a charitable purpose," *Health Plans*, 82 T.C.M. at 602, but found that neither Health Plans, Care, nor Group operated primarily to benefit the community. *Health Plans*, 82 T.C.M. at 605; *Care*, 82 T.C.M. at 625; *Group*, 82 T.C.M. at 615.  For the reasons set forth below, we agree.

1. *The promotion of health as a charitable purpose*

In defining "charitable," our analysis must focus on whether petitioners' activities conferred a *public* benefit.  26 C.F.R. §1.501(c)(3)-1(d)(1)(ii) ("An organization is not organized or operated exclusively for [an exempt purpose] . . . unless it serves a public rather than a private interest.").  The public-benefit requirement highlights the *quid pro quo* nature of tax exemptions:  the public is willing to relieve an organization from the burden of taxation in exchange for the public benefit it provides.  *Geisinger I*, 985 F.2d at 1215; *cf. Flat Top Lake Ass'n v. United States*, 868 F.2d 108, 112 (4th Cir. 1989) ("In many ways, exemption from taxation may be seen as a democratic commonwealth's method of acknowledging the conferral of a universal benefit.").  As the Supreme Court has

---

[12] The Supreme Court construed a similar provision under the Social Security Act in *Better Business Bureau v. United States*, concluding that "a single non-[exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes."  326 U.S. 279, 283 (1945).

recognized, "[c]haritable exemptions are justified on the basis that the exempt entity confers a *public benefit* – a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues." *Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983) (emphasis added).

a. Evolution of the "community benefit" standard

The IRS has long recognized that nonprofit hospitals may be exempt as "charitable" entities under section 501(c)(3). *See generally* John D. Colombo, *Health Care Reform and Federal Tax Exemption: Rethinking the Issues*, 29 WAKE FOREST L. REV. 215, 218 (1994). "Exemption for hospitals, in fact, is so ingrained in the lore of taxation that today about half the states specifically enumerate hospitals as exempt entities, alongside such traditional exemption bulwarks as churches and educational institutions." *Id.* at 215. Early on, the touchstone for exemption was the provision of free or below-cost care. *Id.* at 217. In 1956, the IRS published Rev. Rul. 56-185, which provided that a hospital "must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay."

By the last part of the twentieth century, however, with the advent of Medicare and Medicaid and the increased prevalence of private insurance,

nonprofit hospitals moved away from this "relief of poverty" function.  Colombo *,*
*supra*, at 218.  "The financing of their services evolved in parallel, from primary
dependence on the generosity of religious orders and charitable donors, to almost
exclusive reliance on payments for services rendered."  M. Gregg Bloche, *Health
Policy Below the Waterline: Medical Care and the Charitable Exemption*, 80
MINN. L. REV. 299, 300 (1995).

In 1969, in response to the nonprofit hospital's changing function, the IRS
modified its position regarding charity care.  In Rev. Rul. 69-545, which modified
56-185, the IRS removed "the requirement[] relating to caring for patients without
charge or at rates below cost."  In its discussion, the IRS stated:

> The promotion of health, like the relief of poverty and the
> advancement of education and religion, is one of the purposes in the
> general law of charity that is deemed beneficial to the community as
> a whole even though the class of beneficiaries eligible to receive a
> direct benefit from its activities does not include all members of the
> community, such as indigent members of the community, provided
> that the class is not so small that its relief is not of benefit to the
> community.

Rev. Rul. 69-545.  The hospital in question provided hospital care for all persons
in the community able to pay either directly or through third-party insurers.  The
IRS also noted, however, that the hospital operated an emergency room open to
all persons *regardless of ability to pay.* [13]  In addition, the hospital used surplus

---

[13] In a subsequent ruling, the IRS characterized the hospital's open

(continued...)

-14-

funds to improve patient care and finance medical training, education, and research. Based on these factors, [14] the IRS concluded that the hospital was "promoting the health of a class of persons . . . broad enough to benefit the community." *Id.*

_____

[13](...continued)
emergency room as a "major factor" in its determination. Rev. Rul. 83-157.

[14] The specific facts of the nonprofit hospital in Revenue Ruling 69-545 are as follows:

> Hospital A is a 250-bed community hospital. Its board of trustees is composed of prominent citizens in the community. Medical staff privileges in the hospital are available to all qualified physicians in the area, consistent with the size and nature of its facilities. The hospital has 150 doctors on its active staff and 200 doctors on its courtesy staff. It also owns a medical office building on its premises with space for 60 doctors. Any member of its active medical staff has the privilege of leasing available office space. Rents are set at rates comparable to those of other commercial buildings in the area.

> The hospital operates a full time emergency room and no one requiring emergency care is denied treatment. The hospital otherwise ordinarily limits admissions to those who can pay the cost of their hospitalization, either themselves, or through private health insurance, or with the aid of public programs such as Medicare. Patients who cannot meet the financial requirements for admission are ordinarily referred to another hospital in the community that does serve indigent patients.

> The hospital usually ends each year with an excess of operating receipts over operating disbursements from its hospital operations. Excess funds are generally applied to expansion and replacement of existing facilities and equipment, amortization of indebtedness, improvement in patient care, and medical training, education, and research.

Finally, in Revenue Ruling 83-157, the IRS amplified its prior ruling in 69-545. The hospital in 83-157 was identical to the hospital in 69-545, [15] except that it did not operate an emergency room open to all regardless of ability to pay. In eschewing any rigid test under section 501(c)(3), the IRS made clear that although "[g]enerally, operation of a full time emergency room providing emergency medical services to all members of the public regardless of their ability to pay for such services is strong evidence that a hospital is operating to benefit the community . . . other significant factors . . . may be considered." Rev. Rul. 83-157. The IRS went on to conclude that the hospital did in fact operate for the benefit of the community, noting that the hospital treated patients participating in Medicare and Medicaid and applied any surplus funds to improve facilities, equipment, and patient care, and advance its medical training, education, and research.

Thus, under the IRS's interpretation of section 501(c)(3), in the context of health-care providers, we must determine whether the taxpayer operates *primarily for the benefit of the community*.[16] And while the concept of "community benefit"

---

[15] See note 14, *supra*, for the facts of Rev. Rul. 69-545.

[16] In interpreting these three rulings, court decisions have highlighted several factors relevant under the "community benefit" analysis. These factors include:

      (1)     size of the class eligible to benefit;

(continued...)

is somewhat amorphous, we agree with the IRS, the Tax Court, and the Third Circuit that it provides a workable standard for determining tax exemption under section 501(c)(3).

b.    Defining "community benefit"

In giving form to the community-benefit standard, we stress that "not every activity that promotes health supports tax exemption under § 501(c)(3). For example, selling prescription pharmaceuticals certainly promotes health, but pharmacies cannot qualify for . . . exemption under § 501(c)(3) on that basis alone." Rev. Rul. 98-15. In other words, engaging in an activity that promotes health, *standing alone*, offers an insufficient indicium of an organization's purpose. Numerous for-profit enterprises offer products or services that promote health.

Similarly, the IRS rulings in 69-545 and 83-157 demonstrate that an organization cannot satisfy the community-benefit requirement based solely on

[16](...continued)

     (2)     free or below-cost products or services;
     (3)     treatment of persons participating in governmental programs such as Medicare or Medicaid;
     (4)     use of surplus funds for research or educational programs; and
     (5)     composition of the board of trustees.

*See*, *e.g.*, *Geisinger I*, 985 F.2d at 1218; *see generally Sound Health Ass'n v. C.I.R.*, 71 T.C. 158 (1978); Douglas M. Mancino, *Income Tax Exemption of the Contemporary Nonprofit Hospital*, 32 St. Louis U. L.J. 1015, 1037-70 (1988).

the fact that it offers health-care services to all in the community [17] in exchange for a fee. [18] Although providing health-care products or services to all in the community is necessary under those rulings, it is insufficient, standing alone, to qualify for tax exemption under section 501(c)(3). Rather, the organization must provide some additional "plus."

This plus is perhaps best characterized as "a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues." *Bob Jones Univ.*, 461 U.S. at 591. Concerning the former, the IRS rulings provide a number of examples: providing free or below-cost services, *see* Rev. Rul. 56-185; maintaining an emergency room open to all, regardless of ability to pay, *see* Rev. Rul. 69-545; and devoting surpluses to research, education, and

---

[17] We recognize that certain health-care entities provide specialized services, which are not required by "all" in the community, and we do not mean to foreclose the possibility that such entities may qualify as "charitable" under section 501(c)(3). As the IRS recognized in Rev. Rul. 83-157:

> Certain specialized hospitals, such as eye hospitals and cancer hospitals, offer medical care limited to special conditions unlikely to necessitate emergency care and do not, as a practical matter, maintain emergency rooms. These organizations may also qualify under section 501(c)(3) if there are present similar, significant factors that demonstrate that the hospitals operate exclusively to benefit the community.

[18] At least where the fee is above cost. We express no opinion on whether an enterprise that sold health-promoting products or services entirely at or below cost would qualify for tax exemption under 501(c)(3).

medical training, *see* Rev. Rul. 83-157. These services fall under the general umbrella of "positive externalities" or "public goods." Bloche, *supra*, at 312. [19] Concerning the latter, the primary way in which health-care providers advance government-funded endeavors is the servicing of the Medicaid and Medicare populations.

c.     Quantifying "community benefit"

Difficulties will inevitably arise in quantifying the required community benefit. The governing statutory language, however, provides some guidance. Under section 501(c)(3), an organization is not entitled to tax exemption unless it operates for a charitable *purpose*. Thus, the existence of some incidental community benefit is insufficient. Rather, the magnitude of the community benefit conferred must be sufficient to give rise to a strong inference that the organization operates *primarily for the purpose of benefitting the community*. *Geisinger I*, 985 F.2d at 1219.

---

[19] Under the Treasury Department's view, for-profit enterprises are unlikely to provide such services since "'market prices . . . do not reflect the benefit [these services] confer on the community as a whole.'" Bloche, *supra*, at 312 (quoting Tax-Exempt Status of Hospitals, and Establishment of Charity Care Standards: Hearing before the House Comm. on Ways and Means, 102d Cong., 1st Sess. 34-37 (1991) (statement of Michael J. Graetz, Deputy Assistant Secretary for Tax Policy, U.S. Dep't of the Treasury)). Thus, the provision of such "public goods" – at least when conducted on a sufficiently large scale – arguably supports an inference that the enterprise is responding to some inducement that is not market-based. *Cf. id.*

Thus, our inquiry turns "not [on] the nature of the activity, but [on] the *purpose* accomplished thereby." [20] *Bethel Conservative Mennonite Church v. C.I.R.*, 746 F.2d 388, 391 (7th Cir. 1984) (emphasis added). Of course, because of the inherent difficulty in determining a corporate entity's subjective purpose, we necessarily rely on objective indicia in conducting our analysis. *Geisinger I*, 985 F.2d at 1215 (citation omitted). In determining an organization's purpose, we primarily consider the manner in which the entity carries on its activities. *Living Faith*, 950 F.2d at 372 (citing cases).

### d. The resulting test

In summary, under section 501(c)(3), a health-care provider must make its services available to all in the community *plus* provide additional community or public benefits. The benefit must either further the function of government-funded institutions or provide a service that would not likely be provided within the community but for the subsidy. Further, the additional public benefit conferred must be sufficient to give rise to a strong inference that the public benefit is the *primary purpose* for which the organization operates. In conducting this inquiry, we consider the totality of the circumstances. *Geisinger I*, 985 F.2d

---

[20] As the Third Circuit has noted, "'[w]hen the legality of an action depends not upon its surface manifestation but upon the undisclosed motivation of the actor, similar acts can lead to diametrically opposite legal consequences.'" *Geisinger I*, 985 F.2d at 1215 (quotation omitted).

at 1219.  With these principles in mind, we proceed to review the Tax Court's decision in the present case.

    2.    *The Tax Court correctly defined "charitable" and applied the appropriate legal test under 501(c)(3).*

Petitioners first contend that the Tax Court erred in its conclusion regarding the applicable law.  Based upon our discussion *supra*, we disagree.  The Tax Court correctly recognized the "promotion of health for the benefit of the community" as a charitable purpose.  *Health Plans*, 82 T.C.M. at 602 ("[I]t is now well settled that the promotion of health for the benefit of the community is a charitable purpose.").  Further, the Tax Court considered the community-benefit requirement based on the totality of the circumstances.[21]  *Id.* at 604 ("The community benefit test requires consideration of a variety of factors that indicate whether an organization is involved in the charitable activity of promoting health on a communitywide basis . . . .  Considering all the facts and circumstances . . . we conclude that petitioner did not provide a meaningful community benefit.").  Thus, the Tax Court did not err in determining the applicable law.

    3.    *The Tax Court correctly concluded that petitioners do not*

---

[21] Because the community-benefit requirement is considered under a totality-of-the-circumstances test, we reject petitioners' challenge to the Tax Court's reliance on any one of the numerous factors cited in support of its conclusion.

*operate primarily to promote health for the benefit of the*

*community.*

Petitioners next argue that the Tax Court erred in concluding that petitioners did not operate primarily for the benefit of the community. We disagree.

a. Nature of the product or service and the character of the transaction

In this case, we deal with organizations that do not provide health-care services directly. Rather, petitioners furnish group insurance entitling enrollees to services of participating hospitals and physicians. Petitioners determine premiums using two methods: (1) an adjusted community rating for individuals and small employers; and (2) past-claims experience for large employers. Thus, as in *Church of the Brethren*, petitioners "sell[] insurance coverage . . . extend[ing] benefits in return for a premium based generally on the risk assumed." 759 F.2d at 795. In other words, petitioners primarily perform a "risk-bearing function." *Cf.* Bloche, *supra*, at 399. In *Church of the Brethren*, as in the instant case, the commercial nature of this activity inspired doubt as to the entity's charitable purpose. 759 F.2d at 795; *cf. Federation Pharmacy Servs., Inc. v. C.I.R.*, 72 T.C. 687, 691-92 (1979), *aff'd* 625 F.2d 804 (8th Cir. 1980) (noting that selling pharmaceuticals is "an activity that is normally carried on by a

-22-

commercial profitmaking enterprise[]"). Where, as here, "[i]t is difficult to distinguish the plaintiff corporation from a mutual insurance company," *Hassett v. Assoc. Hosp. Serv. Corp. of Mass.*, 125 F.2d 611, 614 (1st Cir. 1942), we must carefully scrutinize the organization's operation. [22] *Cf. Church of the Brethren*, 759 F.2d at 795; *Am. Ass'n of Christian Schools Voluntary Employees Beneficiary Ass'n Welfare Plan Trust by Janney v. United States*, 850 F.2d 1510, 1516 (11th Cir. 1988) ("Since the Trust has a substantial private purpose to provide insurance in return for premiums, it is not an organization exclusively engaged in the promotion of the social welfare."). [23]

> b.      Free or below-cost products or services

The fact that an activity is normally undertaken by commercial for-profit entities does not necessarily preclude tax exemption, particularly where the entity offers its services at or below-cost. *Cf.* Bloche, *supra*, at 311 n.31. But

---

[22] We recognize that an activity that is not "inherently charitable" may nonetheless further a charitable purpose. Rev. Rul. 69-572. Thus, we do not accord dispositive weight to this (or any other) factor.

[23] We are primarily concerned with this characteristic as it bears on our determination of petitioners' purpose. However, we also note that petitioners not only resemble commercial insurance providers, petitioners in fact compete with commercial insurance providers. Thus, "granting a tax exemption to [petitioners] would necessarily disadvantage other for-profit [entities] with which [petitioners] compete[]." *Federation Pharmacy Servs., Inc. v. C.I.R.*, 625 F.2d 804, 808 (8th Cir. 1980) (citing *Abbott Labs. v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 17-18 (1976)).

petitioners provide virtually no free or below-cost health-care services.[24] All enrollees must pay a premium in order to receive benefits.[25] As the Eighth Circuit has recognized, "[a]n organization which does not extend some of its benefits to individuals financially unable to make the required payments [generally] reflects a commercial activity rather than a charitable one." *Federation Pharmacy Servs., Inc. v. C.I.R.*, 625 F.2d 804, 807 (8th Cir. 1980). Further, the fact that petitioners in no way subsidize dues for those who cannot afford subscribership distinguishes this case from the HMOs in *Sound Health Ass'n v. C.I.R.*, 71 T.C. 158 (1979), and *Geisinger I*, 985 F.2d at 1219.

We acknowledge, as did the Tax Court, that petitioners' "adjusted community rating system[] likely allowed its enrollees to obtain medical care at a lower cost than might otherwise have been available." *Care*, 82 T.C.M. at 625; *Group*, 82 T.C.M. at 615. Again, however, selling services at a discount tells us little about the petitioners' *purpose*. "Many profitmaking organizations sell at a discount." *Federation Pharmacy*, 72 T.C. at 692, *aff'd* 625 F.2d 804 (8th Cir. 1980). In considering price as it relates to an organization's purpose, there is a

---

[24] Health Plans did apparently conduct some free health screenings in 1999. *Health Plans*, 82 T.C.M. at 605.

[25] Petitioners note that Care and Group offered "risk" and "cost" Medicare health plans, and contend that Care and Group went forward with these plans "with the full knowledge that those plans might lose money." Care and Group discontinued these plans, however, based on concerns of "financial feasibility."

qualitative difference between selling at a discount and selling below cost. [26]

In sum, petitioners sole activity is arranging for health-care services in exchange for a fee. To elevate the attendant health benefit over the character of the transaction would pervert Congress' intent in providing for charitable tax exemptions under section 501(c)(3). Contrary to petitioners' insinuation, the Tax Court did not accord dispositive weight to the absence of free care. Neither do we. Rather, it is yet another factor that belies petitioners' professions of a charitable purpose. [27]

### c.    Research and educational programs

Nothing in the record indicates that petitioners conducted research or offered free educational programs to the public. [28] This bolsters our conclusion that petitioners did not operate for the purpose of promoting health for the benefit of the community.

---

[26] Further, as the Tax Court noted, "the benefit associated with these cost savings is more appropriately characterized as a benefit to petitioner[s]' enrollees as opposed to the community at large." *Care*, 82 T.C.M. at 625; *Group*, 82 T.C.M. at 615.

[27] As the Eighth Circuit has noted, "a 'charitable' hospital may impose charges or fees for services rendered, and indeed its charity record may be comparatively low depending upon all the facts . . . but a serious question is raised where its charitable operation is virtually inconsequential." *Federation Pharmacy*, 625 F.2d at 807 (8th Cir. 1980) (quoting *Sonora Cmty. Hosp. v. C.I.R.*, 46 T.C. 519, 526 (1966)) (internal quotation marks omitted).

[28] As the Tax Court noted, petitioners' Core Wellness Program was offered exclusively to enrollees.

d.      The class eligible to benefit

(1)     Health Plans

As the Tax Court noted, "[Health Plans] offered its [coverage] to a broad cross-section of the community including individuals, the employees of both large and small employers, and individuals eligible for Medicaid benefits." *Health Plans*, 82 T.C.M. at 604. In fact, in 1999, Health Plans' enrollees represented twenty percent of Utah's total population and fifty percent of Utah residents eligible for Medicaid benefits. [29]

Nevertheless, even though almost all Utahans were potentially eligible to enroll for Health Plans coverage, the self-imposed requirement of membership tells us something about Health Plans' operation. As the Third Circuit noted in *Geisinger I* :

> The community benefitted is, in fact, limited to those who belong to [the HMO] since the requirement of subscribership remains a condition precedent to any service. Absent any additional indicia of a charitable purpose, this self-imposed precondition suggests that [the HMO] is primarily benefitting itself (and, perhaps, secondarily benefitting the community) by promoting subscribership throughout the areas it serves.

985 F.2d at 1219. Further, w    hile the absence of a large class of potential

---

[29] We acknowledge that Health Plans' service to Utah's Medicaid community provides some community benefit. The relevant inquiry, however, is not "whether [petitioner] benefitted the community at all . . . [but] whether it primarily benefitted the community, as an entity must in order to qualify for tax-exempt status." *Geisinger I*, 985 F.2d at 1219.

beneficiaries may preclude tax-exempt status, its presence standing alone provides little insight into the organization's purpose. Offering products and services to a broad segment of the population is as consistent with self promotion and profit maximization as it is with any "charitable" purpose.

### (2) Care and Group

Neither Care nor Group offered their health plans to the general public. Rather, both Care and Group limited their enrollment to employees of large employers (employers with 100 or more employees). Thus, as the Tax Court found, "[Care and Group] operate[d] in a manner that substantially limit[ed] [the] universe of potential enrollees." *Care*, 82 T.C.M. at 625; *Group*, 82 T.C.M. at 615. Based on this finding, the Tax Court correctly concluded that neither Care nor Group promoted health for the benefit of the community.

### e. Community board of trustees

Finally, we consider petitioners' board composition. Prior to 1996, Health Plans' bylaws provided that "[a] plurality of Board members shall represent the buyer-employer community and an approximately equal number of physicians and hospitals representatives shall be appointed." As the IRS noted, Health Plans' pre-1996 bylaws skewed control towards subscribers, rather than the community at large. In 1996, however, Health Plans amended its bylaws to require that a majority of board members be disinterested and broadly representative of the

community.

It makes little difference whether we consider petitioners' board prior to 1996 or following the amendments. Even if we were to conclude petitioners' board broadly represents the community, the dearth of any actual community benefit in this case rebuts any inference we might otherwise draw.

4. *Conclusion*

For the above reasons, we agree with the Tax Court's conclusion that petitioners, standing alone, do not qualify for tax exemption under section 501(c)(3).

D. *Whether Petitioners Qualify for Tax-Exempt Status as an "Integral Part" of Health Services.*

Petitioners contend that even if they do not qualify for tax exemption standing alone, they qualify based on the fact that their activities are an "integral part" of Health Services, essential to Health Services in accomplishing its tax-exempt purpose. We disagree.

In general, "separately incorporated entities must qualify for tax exemption on their own merits." *Geisinger Health Plan v. C.I.R.*, 30 F.3d 494, 498 (3d Cir. 1994) (*Geisinger II*) (citing *Church of the Brethren*, 759 F.2d at 795 n.3). Several circuits, however, have recognized a so-called "exception" to this general rule, commonly called the integral-part doctrine. *See, e.g., id.* ("[The] 'integral part

doctrine' . . . may best be described as an exception to the general rule that entitlement to exemption is derived solely from an entity's own characteristics."); *Tex. Learning Tech. Group v. C.I.R.*, 958 F.2d 122, 126 (5th Cir. 1992); *Squire v. Students Book Corp.*, 191 F.2d 1018, 1020 (9th Cir. 1951). Under the integral-part doctrine, where an organization's sole activity is an "integral part" of an exempt affiliate's activities, the organization may derive its exemption from that of its affiliate. *Geisinger II*, 30 F.3d at 498; *see also Geisinger I*, 985 F.2d at 1220 ("The integral part doctrine provides a means by which organizations may qualify for exemption vicariously through related organizations, as long as they are engaged in activities which would be exempt if the related organizations engaged in them, and as long as those activities are furthering the exempt purposes of the related organizations.").

To the extent the integral-part doctrine rests on a derivative theory of exemption, it runs contrary to two fundamental tenets of tax law: (1) the "doctrine of corporate entity," under which a corporation is a separate and distinct taxable entity;[30] and (2) the canon of statutory interpretation requiring strict construction of exemptions from taxation.[31] *Bingler*, 394 U.S. at 751-52. IHC

---

[30] *See*, *e.g.*, *Moline Prop. v. C.I.R.*, 319 U.S. 436, 438 (1943); *Church of the Brethren*, 759 F.2d at 795 n.3.

[31] As the Third Circuit noted in *Geisinger II*, the "integral-part doctrine" is not codified. 30 F.3d at 499. Although it finds support in 26 C.F.R. § 1.502-1(b),

(continued...)

-29-

separately incorporated Health Services, Health Plans, Care, and Group. "It cannot now escape the tax consequences of that choice, no matter how bona fide its motives or longstanding its arrangements." *Nat'l Carbide Corp. v. C.I.R.*, 336 U.S. 422, 439 (1949). Further, we reject petitioners' contention that the integral-part doctrine constitutes a "less rigorous" road to tax exemption. The rigor of the charitable-purpose requirement remains constant, regardless of the theory upon which the taxpayer bases its entitlement to tax exemption under section 501(c)(3).

Nevertheless, to the extent the integral-part doctrine recognizes that we should consider the totality of the circumstances in determining an organization's purpose, the doctrine is in accord with our section 501(c)(3) jurisprudence. One of the myriad factors we may consider in determining an organization's purpose is whether an essential nexus exists between an organization seeking tax exemption and a tax-exempt affiliate. The example cited in the Treasury Regulations aptly illustrates the point: "a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities." [32] 26 C.F.R.

---

[31](...continued)
it must ultimately be justified under section 501(c)(3) and its charitable-purpose requirement.

[32] We need not decide whether such an organization operates for an exempt purpose per se. We merely note that these facts would suggest that the subsidiary operates for an exempt purpose.

§ 1.502-1(b). In other words, as we interpret the integral-part doctrine, it simply recognizes that "[t]he performance of a particular activity that is not inherently charitable may nonetheless further a charitable purpose." Rev. Rul. 69-572. "The overall result in any given case is dependent on *why* and *how* that activity is actually being conducted." *Id.* (emphasis added).

Using the example cited in Treasury Regulation 1.502-1(b), if we were to consider the nature of the subsidiary's activity in isolation – furnishing electricity – we would have no indication that the subsidiary serves an exempt purpose. On the other hand, when we look at the totality of the circumstances, it becomes clear that the subsidiary's activity furthers the exempt purpose of education: the product provided is essential; the subsidiary furnishes its product solely to the tax-exempt affiliate; [33] and the tax-exempt parent exercises control over the

---

[33] The IRS contrasted the following hypothetical:

[T]he subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization.

26 C.F.R. § 1.502-1(b).

subsidiary. These facts, considered in conjunction with the exempt purpose for which the tax-exempt parent operates, support a strong inference that the subsidiary operates for the same exempt purpose as does the parent.

In this case, we need not decide whether petitioners provide a service necessary to Health Services in conducting its exempt activities. The required nexus between the activities of petitioners and Health Services is lacking. As the Tax Court noted, "petitioner[s]' enrollees received approximately 20 percent of their physician services from physicians employed by or contracting with Health Services, while petitioner contracted for the remaining 80 percent of such physician services directly with independent physicians." *Health Plans*, 82 T.C.M. at 606. Thus, unlike the subsidiary furnishing electricity in Treasury Regulation § 1.502-1(b), petitioners do not function solely to further Health Services' performance of its exempt activities. Rather, a substantial portion (eighty percent) [34] of petitioners' enrollees received physician services from

---

[34] The following table, taken from petitioners' brief, presents a percentage breakdown of petitioners' total billings for physician services:

| Year | Employed | Not employed/ Panel | Not employed/ Non-panel |
|------|----------|---------------------|-------------------------|
| 1997 | 23.4 % | 64.3 % | 12.3 % |
| 1998 | 22.1 % | 65.8 % | 12.1 % |
| 1999 | 20.5 % | 69.2 % | 10.3 % |

(continued...)

"physicians with no direct link to [Health Services]."[35] *Health Plans*, 82 T.C.M. at 606. Thus, our consideration of petitioners' "connectedness" to Health Services in no way detracts from our earlier conclusion that petitioners do not qualify for a charitable tax exemption under section 501(c)(3).

### III. Conclusion

Based on the foregoing, we AFFIRM the Tax Court's decision denying petitioners tax-exempt status under 26 U.S.C. § 501(c)(3).

---

[34](...continued)

"Employed" includes those physicians employed by Health Services' Physician Division. "Not employed/Panel" includes independent contractors who had medical staff privileges at a Health Services hospital. "Not employed/Non-panel" includes all other physicians.

[35] We recognize that when we consider petitioners standing alone, drawing a distinction between a "staff-model HMO" (as in *Sound Health*) and a "contract HMO" (as in *Geisinger* and here) may not make sense. Colombo, *supra*, at 245. "[T]he 'community benefits' attributable to a particular [HMO] are the same whether treatment is performed by employee physicians or independent contractors pursuant to a service agreement." *Id.* at 245-46. Under the integral-part doctrine, however, the distinction is highly relevant, since we seek to determine whether an essential nexus exists between petitioners' operations and those of Health Services, the tax-exempt affiliate.